```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                   CASE NO. 11-20587-CRIMINAL-SCOLA
3

4    UNITED STATES OF AMERICA,          Miami, Florida

5                    Plaintiff,         May 11, 2012

6         vs.                           2:07 p.m. to 3:28 p.m.

7    THOMAS HAMER,

8                    Defendant.         Pages 1 to 68

9    _____

10                         SENTENCING HEARING
              BEFORE THE HONORABLE ROBERT N. SCOLA, JR.,
11                   UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

     FOR THE GOVERNMENT:     ALICIA E. SHICK, ESQ.
15                           ASSISTANT UNITED STATES ATTORNEY
                             99 Northeast Fourth Street
16                           Miami, Florida 33132

17

     FOR THE DEFENDANT:      WILLIAM R. BARZEE, ESQ.
18                           40 Northwest Third Street
                             Penthouse I
19                           Miami, Florida 33128

20

     FOR US PROBATION:       JESSICA MANZANARES
21

22   REPORTED BY:            LISA EDWARDS, CRR, RMR
                             Official Court Reporter
23                           400 North Miami Avenue
                             Twelfth Floor
24                           Miami, Florida 33128
                             (305) 523-5499
25              THE COURT:  Good afternoon, everyone.  Thank you.  Be
```

```
 1    seated.
 2            The next case is United States of America versus
 3    Thomas -- "Hamer" or "Hamer"?
 4            THE DEFENDANT:  "Hamer," your Honor.
 5            THE COURT:  Hamer.
 6            State your appearances, please.
 7            MS. SHICK:  Good afternoon, your Honor.  Alicia Shick
 8    on behalf of the United States.  And with me at counsel table
 9    are FBI Special Agents Jake McGinty and Diane Lindsey.
10            THE COURT:  Good afternoon.
11            MS. SHICK:  Good afternoon.
12            MR. BARZEE:  Good afternoon.  William Barzee on behalf
13    of Thomas Hamer, who's present.
14            THE COURT:  Good afternoon.
15            And this is set for sentencing this afternoon.  Are
16    both sides prepared to go forward with the sentencing?
17            MS. SHICK:  Yes, your Honor.
18            MR. BARZEE:  Yes, your Honor.
19            THE COURT:  Who's here on behalf of Probation?
20            THE PROBATION OFFICER:  Good afternoon.  Jessica
21    Manzanares on behalf of US Probation.
22            THE COURT:  Good afternoon.
23            Has each side had an opportunity to receive and review
24    the presentence investigation report?
25            MS. SHICK:  Yes, your Honor.
```

```
 1              MR. BARZEE:  Yes, your Honor.

 2              THE COURT:  Mr. Hamer, have you seen it and reviewed

 3   it?

 4              THE DEFENDANT:  Yes, your Honor.

 5              THE COURT:  So let's first take up the objections.

 6              As I read the objections that Mr. Hamer prepared, they

 7   don't seem to be objections that would affect the guidelines

 8   calculations.  Is that correct?

 9              MR. BARZEE:  That is correct, your Honor.

10              THE COURT:  They're more just factual things about his

11   background.

12              The Government is taking issue with your objection to

13   Paragraph 36.  So what is the significance of that, whether

14   it's the way he states it or the way you state it, Ms. Shick,

15   in terms of the sentence?

16              MS. SHICK:  Your Honor, no.  I just -- for the PSI, I

17   have to just correct factually what the evidence is that the

18   Government has.  And although I mentioned the IPE was not

19   something generally filled out by therapists, that the IDA, or

20   the integrated diagnostic assessment, is something that's

21   filled out.

22              THE COURT:  Let me ask you a question:  Is the

23   Government's additional information or clarifications that they

24   include in their response to your objections -- do you have any

25   objection to that presentation?
```

```
 1              THE DEFENDANT:  Yes, your Honor.

 2              THE COURT:  And what part of their statement?

 3              THE DEFENDANT:  Well, when Mrs. Shick changed her -- I

 4     don't know how to put this -- her initials from initial

 5     psychiatric evaluation to initial diagnostic assessment, which

 6     we call the biopsychosocial, it would be unlikely or nearly

 7     impossible for a patient to get to me for me to do a

 8     biopsychosocial without having seen a psychiatrist.

 9              But they could be -- an IPE, which is something I

10     never wrote -- an IPE could be written without the patient

11     seeing the psychiatrist.  But that would be a case where the

12     patient showed up for one day when the psychiatrist wasn't

13     there; and I wouldn't have seen the patient until the third,

14     fourth or fifth day.  So I'm quite certain --

15              THE COURT:  So it's not that you didn't prepare the

16     bios; it's that you didn't prepare them without the patient

17     having seen a psychiatrist or some other doctor?

18              MR. BARZEE:  That is correct.

19              MS. SHICK:  Your Honor, may I briefly respond?

20              THE COURT:  Yes.

21              MS. SHICK:  It's up to the Court's discretion.  But if

22     Mr. Hamer is going to be responding instead of his attorney, I

23     would ask that he be placed under oath.

24              As far as --

25              THE COURT:  For what reason?
```

```
 1          MS. SHICK:  Well, as far as the fraud is concerned,

 2   he's making statements to the Court that are not true.

 3          THE COURT:  If I find that they're not true, do you

 4   think I'm going to treat him differently because he's not under

 5   oath versus under oath?

 6          MS. SHICK:  Your Honor, typically, the Courts have

 7   done that in the past.  But if you don't want --

 8          THE COURT:  If somebody lies to me, there's nothing

 9   good that is going to happen to them.  So the fact they weren't

10   under oath when they lied to me is of no moment to me.

11          MS. SHICK:  Your Honor, as Mr. Hamer knows and the

12   Court may now know, because you've been educated about this

13   case, the routine practice of Biscayne Milieu, as the Defendant

14   himself noted in his sentencing memorandum, was to -- as soon

15   as the patient comes in the door, they start billing for the

16   patient.  The patients very rarely saw a psychiatrist prior to

17   being admitted.  In fact, I would go as far as to say nine

18   times out of ten they didn't see a psychiatrist prior to being

19   billed by Biscayne Milieu for services.

20          Mr. Hamer, like the other Defendants in this case, was

21   well aware of that fact.  They were writing IDAs, or integrated

22   diagnostic assessments, for these patients prior to having been

23   seen by any psychiatrist.

24          Moreover, the psychiatrists who were employed by

25   Biscayne were either the two main doctors, Dr. Shapiro and
```

```
 1    Dr. Kushner, were only there one day a week.  So they were not
 2    seeing patients every single day.  And there were droves of
 3    patients being brought to the facility by the quote-unquote
 4    "case managers" on a daily basis.
 5            So --
 6            THE COURT:  How would he know that they had not seen a
 7    doctor prior to their participating in his therapy?
 8            MS. SHICK:  Well, first, when we debriefed him, he
 9    admitted as much, that most of the patients that were brought
10    in were not seen by a psychiatrist.
11            And moreover, again, as I said, the overall scheme,
12    which, again, everyone that participated in it was aware, that
13    the people that were being seen -- it mostly fell on the
14    therapists' shoulders to do the initial biopsychosocial
15    assessments.  And if there was time permitting, an IP would be
16    done later by the psychiatrist; and additionally, not always a
17    legitimate IPE.  I mean, I don't want to get too far afield,
18    but there were many IPEs that were written by a consultant who
19    never saw patients that were admitted to the facility.
20            And as I said, Mr. Hamer in the sentencing memorandum
21    talks about the fact that, you know, it was billed, so you need
22    to do it.  He was very well aware of the culture and the scheme
23    to bill first, ask questions later.
24            So he knew, just like the other therapists knew, that
25    the overarching theme and the overarching scheme was to admit
```

```
 1    the patients, be seen by a therapist, put into a group, start
 2    billing; and then, if and when time permitted, sometimes they
 3    would be seen by a psychiatrist, most oftentimes not.
 4              THE COURT:  In terms of my sentence of him, if he
 5    acknowledges, which I think he already has, that he saw
 6    patients that didn't qualify, that he prepared notes, therapy
 7    sessions for people that didn't participate, what else do I
 8    need to know?
 9              MS. SHICK:  Well, if we're going to address -- it
10    sounds like we're addressing the acceptance.
11              THE COURT:  No.  I'm just saying, this one
12    paragraph --
13              MS. SHICK:  The one paragraph, as I said, your Honor,
14    I brought it out because it's our obligation to correct facts
15    in the record.
16              And while Mr. Hamer's right that he didn't write the
17    IPEs, nonetheless, he would see patients -- we have evidence of
18    it -- that were not seen by psychiatrists, first and foremost;
19    and he was doing their integrated diagnostic assessment and he
20    was doing, as you already pointed out and as he admitted, group
21    notes for patients that oftentimes did not appear.
22              So --
23              THE COURT:  The only thing he's really saying is, I
24    never drafted an initial psychiatric evaluation.  And you agree
25    that he didn't.
```

```
 1              MS. SHICK:  That is correct.  But the statement he

 2   just made -- again, I'm not going to not correct the record

 3   when he says something that again rings untrue when he says, I

 4   didn't know -- it's virtually impossible for me to see a

 5   patient unless a psychiatrist approves them for admission and

 6   saw them first.

 7              That's not true.

 8              THE DEFENDANT:  It is true, your Honor.

 9              THE COURT:  I'm going to -- I'll sustain the defense

10   objection to Paragraph 36.

11              And the Government agrees that none of his other

12   objections are of any great moment -- you don't have any

13   evidence to refute it -- so I will sustain his objections to

14   the identifying data in Paragraphs 71, 75, 79 and 89.

15              So let's get to the next disputed issue, which is the

16   acceptance.

17              MS. SHICK:  Your Honor, with respect to the

18   acceptance, your Honor knows I filed a memorandum with the

19   Court addressing that issue.

20              But more specifically, one of the things that the

21   Defendant mentions in his sentencing memorandum, he's trying to

22   compare the sentencing guideline range he's now facing without

23   acceptance, which begins at 63 months and ranges to 78 months,

24   to a multitude of other criminal activities that in his mind --

25   and his argument is that --
```

1          THE COURT:  Well, we're not there.  Let's talk about

2    acceptance.

3          MS. SHICK:  With regard to the acceptance, your Honor,

4    again, as I pointed out in my memorandum, the Defendant, as you

5    know, wrote a letter to this Court filed with the Court

6    attempting to withdraw his plea in this case.

7          In that letter, the Defendant specifically discusses

8    the fact that he was not a part of a conspiracy, that he didn't

9    receive any unjust enrichment and that he did not commit

10   healthcare fraud.

11         That flies in the face of acceptance.

12         And, your Honor, as the Court pointed out in its own

13   order, which was entered into shortly after the withdrawal of

14   the plea, or attempted withdrawal of the plea -- and the

15   Court's order is Docket Entry 552 -- the Court specifically

16   noted that the Defendant's later assertions of innocence are

17   not credible.

18         Obviously, the Government agrees, as does Probation.

19         First and foremost, your Honor, I have never had a

20   defendant who has come forward, denied relevant conduct, denied

21   that he had done certain things and then received acceptance.

22         The acceptance --

23         THE COURT:  What specific relevant conduct did he

24   deny?

25         MS. SHICK:  Well, specifically, your Honor, he said he

```
 1    wasn't involved in a conspiracy and he said he didn't commit
 2    healthcare fraud.
 3              THE COURT:  You've got to look at the big picture of
 4    what was happening that day.  He was obviously -- even though
 5    he took a plea, he -- there's people that they take a plea and
 6    they're happy to take a plea.  There's other people that take a
 7    plea, and I can tell at least that he was not happy.
 8              So I turned to you.  I said, "Ms. Shick, did Mr. Hamer
 9    profit from his activities in this conspiracy or was he just
10    getting his salary?"
11              And you said, "He's just getting his salary."
12              And I said, with the hope of having him understand
13    that when we came to today, the fact he was only getting a
14    salary would carry great weight to me even if it didn't to you.
15    I said, "You're going to consider that at the time of
16    sentencing in terms of level of culpability."
17              You said that you would.
18              And he, apparently, being an idiot, took that to mean
19    that, Well, if I'm not profiting, I'm not involved in a
20    conspiracy.
21              So the fact that he writes a stupid letter to me based
22    on something that I said is not the same -- he's making a
23    stupid legal argument.  He didn't say, "I didn't prepare false
24    reports."  He didn't say, "I didn't commit the acts."  He's
25    just saying, "Well, look, the Judge pointed out that I never
```

```
 1   made any money, and the indictment says people made money; so
 2   therefore, I must not be guilty."
 3            MS. SHICK:  I understand the Court's point.
 4            But let me just add, though, that we're not just
 5   talking about the letter.  That was my -- first and foremost
 6   was the letter, because, again, in my experience, I have not
 7   seen that.
 8            THE COURT:  Okay.
 9            MS. SHICK:  The sentencing memorandum, though, that
10   Mr. Hamer recently filed with the Court also outlines why
11   acceptance shouldn't be given in this case.
12            And specifically, if you turn to -- I'll say as a
13   whole, your Honor, after having read the sentencing memorandum,
14   the only thing that I saw throughout that was consistent was,
15   "It's somebody else's fault; I was pushed into this; I didn't
16   really do what I was doing.  It was because somebody ordered me
17   to do it."
18            The letters filed with the Court echo the exact same
19   theme.  Specifically, on Page 7 of the sentencing memorandum,
20   he discusses the paperwork that he had to fill out.  And he's
21   blaming his supervisor, John Jackson, who was also charged in
22   this case, that he didn't do any training; he didn't correct
23   him; he didn't give any guidance to him.
24            That is completely irrelevant.  Nobody, number one,
25   should have to be given guidance when it's very plain and
```

1    obvious that if you write a note for a patient who is not

2    there, that that's fraud.

3            Mr. Jackson, as an aside, who has been sentenced in

4    front of Judge Ungaro, is doing 97 months right now.  We

5    anticipate there will be a cooperation 5K, or rather a Rule 35,

6    filed for him.  But in contrast, Mr. Jackson came in and

7    admitted his guilt wholly, took responsibility for everything,

8    didn't hedge, didn't minimize, didn't blame other people.

9            That's what acceptance is for, your Honor.

10           The purpose of the acceptance guideline under the

11   Sentencing Commission's view is that we want to encourage that

12   people accept what they've done so that there is a lack of

13   recidivism after they've served their time.

14           The sentence is for punishment, but it's also for

15   making certain that you have an understanding and appreciation

16   that what you had done was wrong and that you are not going to

17   repeat the conduct.

18           And getting to that, your Honor, also, on the same

19   page of his memorandum, Page 7 -- and this is in Footnote 3 --

20   he talks about the master treatment plan.  He says, "In most

21   situations, clinically, it's very important.  It wasn't at

22   Biscayne."  Actually, he didn't say Biscayne.  He says, "This

23   is not the case in a PHP generally."  He says.  "The master

24   treatment plan really has no bearing; it's not significant."

25           That's also not true.  The master treatment plan is

1    the thing that Medicare looks to to see when I'm evaluating

2    this patient, Is this patient improving?  What are the

3    patient's problems?  How are we going to address those issues,

4    resolve those issues?  How much time do we think is going to be

5    needed by this patient to progress?

6         That's reviewed, signed, evaluated by every therapist,

7    every doctor who sees that patient and that is the -- one of

8    the most significant things in a PHP, to evaluate whether or

9    not this patient should still be in a PHP.

10        Then on Page 8, again, the Defendant says, "Under the

11   fraud at Biscayne, you have to do it because they already

12   billed for it," which is a theme that we have echoed many times

13   to the Court.  That is exactly what was going on at Biscayne.

14   But the way the Defendant couches it here at the bottom, he

15   says he either had to do it or risk being fired.

16        That again is not acceptance.  That is saying, again,

17   "It is someone else's fault.  I was ordered to do this, so I

18   did it."

19        On the following page, Page 9, he references, "On a

20   handful of documents, I was told to write something I knew to

21   be false."

22        "A handful of documents" is not accurate in the least.

23   We have come through many, many records -- I've brought some of

24   them with me here today, if the Court was interested -- where

25   this Defendant not only cut and pasted from one note to

```
 1    another, from one patient to another, but also would write

 2    quotations from these patients.  They're identical.

 3                 THE DEFENDANT:  What?

 4           MS. SHICK:  So he says here on Page 9, "Rather than

 5    fight the administration, I did what I was told to do.  I now

 6    deeply understand that I was wrong to do so."

 7                 At the time he was committing the crime, he's

 8    suggesting -- this is the difference, the fundamental

 9    difference between someone saying, "I am sorry for what I did

10    because I was caught" or "I am sorry for what I did because at

11    the time I did it, I knew that it was wrong."

12                 For him to suggest that --

13           THE COURT:  Well, you can't get acceptance of

14    responsibility if at the time you were doing it you kind of

15    rationalized it and you thought there was some explanation to

16    get you through the day; but after you were arrested, you truly

17    said, Now that I think about it, I know that I was wrong?

18           MS. SHICK:  If -- again, I agree with the Court.  If

19    it was after his arrest and he said, You know what?  I do.  I

20    have an appreciation now of what I have done and I am admitting

21    that I did it.

22                 But again, as I said, I'll continue going through --

23                 THE COURT:  It says, "I now deeply understand that I

24    was wrong to do so."

25           MS. SHICK:  Your Honor, again --
```

```
 1              THE COURT:  He's saying, "At that time I was doing

 2   this and -- but now I understand it was wrong."

 3              Isn't that what acceptance is?  It's now.

 4              If people were accepting their responsibility while

 5   they're committing the crime, they wouldn't have finished the

 6   crime.

 7              MS. SHICK:  I agree.  But, your Honor, again, that one

 8   sentence in the memorandum is -- it flies in the face of

 9   everything else that he's saying, everything else he said to

10   this Court, every time I've appeared before you at a hearing.

11              On December 16, he had said the assignment thing.  And

12   this was well prior to even his entrance of a plea where he

13   was -- he went through -- and I cited this in my objection --

14   "I was never part of a conspiracy.  I never had the intent to

15   do this."

16              Again, on the same page, he said, you know, "Listen.

17   I had nothing to do with who was admitted to my group.  I just

18   did the best that I could."

19              That is not acceptance.  He is again minimizing his

20   involvement with this because he's saying it's somebody else's

21   fault that they admitted this patient.  "I just did what I was

22   asked to do.  I did my best."

23              And, your Honor, the important thing that I'm trying

24   to emphasize here is, if somebody feels that way, which

25   Mr. Hamer clearly does, and he's entitled to feel however he
```

1   wants to throughout this, but how are we to be certain that

2   once this Court sentences him he's not going to go out and

3   repeat the conduct?

4         And I would bring up somebody very, very significant

5   in that regard.  This was something that was taken into account

6   by Magistrate Judge White at the time we had been arguing about

7   the bond conditions.

8         After, after this Defendant met with the agents in

9   this case, after this Defendant met with me in this case, he

10  was aware that he was a target.  And again, I'm happy to

11  address again all of the things that are very inconsistent in

12  his own statement about whether he was offered immunity, which

13  is ridiculous.  Agents don't go around offering immunity to

14  targets.

15        Mr. Hamer was always a target.  He was never offered

16  immunity.  He was never told, "Listen, you're going to have

17  immunity."  The thing I found even more shocking is that in the

18  sentencing memorandum he said, not only was he offered

19  immunity, but he turned it down.

20        I don't know anyone who would ever, ever turn down

21  immunity.

22        But in any event, the most significant thing

23  Magistrate Judge White found was that even after having met

24  with us, he went back and committed fraud, blatantly.

25        The count in the indictment, the count we've been

1    hearing so much about that's referenced in this memorandum and

2    others, about the patient N.S., last name Stewart:  He went in

3    and created a fraudulent group note for a patient that he knew

4    was not there after, after he met with the agents, after he met

5    with the Government, after he was told, "You are a target of

6    this investigation.  There is fraud going on.  You can either

7    choose to help yourself and cooperate on the front end or

8    you're going to be charged.  Those are your options."

9            He chose not to cooperate.  He --

10           THE COURT:  Oh, so if an agent tells somebody who's

11   not a lawyer, "You can either cooperate or you're going to be

12   charged," wouldn't that person come to an understanding, Oh, I

13   guess if I cooperate, I am not going to be charged, which is

14   like getting immunity?

15           MS. SHICK:  Your Honor, you misunderstood.

16           The statement was never, "You" --

17           THE COURT:  I misunderstood?  That's exactly what you

18   just said.

19           MS. SHICK:  I didn't say, You can either cooperate or

20   not -- and not be charged if you cooperate.

21           THE COURT:  You said, "You can either cooperate or you

22   will be charged."  The converse of that is, I guess, If I do

23   cooperate, I won't be charged.  And somebody who's not a lawyer

24   would think that's kind of the equivalent of immunity.

25           MS. SHICK:  No, your Honor.  Maybe I'm not being

```
 1   clear.

 2              The statement was, "You are going to be charged,

 3   period.  You can either help yourself and cooperate or you can

 4   sit at the defense table with the rest of the Defendants going

 5   to trial.  Those are the options."

 6              It's not an either/or, that, "If you cooperate, you're

 7   not going to be charged."

 8              It's, "You're a target.  You've admitted to conduct.

 9   We have evidence of your fraudulent conduct.  So you're going

10   to be charged.  Now the only question is, what do you want to

11   do?  Do you want to cooperate with the Government and in doing

12   so" --

13              THE COURT:  This is the realtime.  This is what you

14   said.

15              MS. SHICK:  I'll admit --

16              THE COURT:  "You are a target of this investigation.

17   There's a fraud going on.  You can either choose to help

18   yourself and cooperate on the front end or you're going to be

19   charged."

20              MS. SHICK:  That --

21              THE COURT:  If that's what he said -- what he was told

22   by the agents, wouldn't that lead him to believe if he

23   cooperated he wouldn't be charged, which is like getting

24   immunity?

25              MS. SHICK:  Your Honor, I sincerely hope you're not
```

```
 1    going to hold me to something I misspoke at the end of that

 2    sentence.

 3            THE COURT:  But you want me to hold him to things that

 4    he misspoke about.

 5            MS. SHICK:  Your Honor, the agents are right here.

 6    They'll be subject to cross-examination all day long.  We have

 7    302s.  He was never offered immunity, never told he was going

 8    to be charged.

 9            THE COURT:  So go ahead.  Let's get to the --

10    finish --

11            MS. SHICK:  The larger point in all of this, your

12    Honor, is that, again, after -- even whatever he was told --

13    I'll give him the benefit of the doubt, even though this is

14    absolutely not true.  Let's say in your hypothetical he was

15    offered immunity:  "Mr. Hamer, go back, commit fraud with

16    impunity because you have immunity."

17            That would never have been said to him, ever, in any

18    scenario.

19            But in any event, he met with the Government and he

20    met with the agents.  He knew -- we knew what was going on at

21    Biscayne.  And he chose, instead of quitting, which is what

22    most innocent people would do; they don't need to necessarily

23    cooperate with the Government.  You know, it depends on the

24    kind of person you are.

25            If you want to offer to help, great.  If you don't, at
```

 1    least at the very minimum you know what's going on now.  You

 2    can't say, "I had no idea -- oh, my God -- there's gambling

 3    going on in this casino in Casablanca."  You know what's going

 4    on; you stay there; and not only do you stay, but you commit

 5    fraud.

 6            I have other instances, your Honor, right after we

 7    met -- the agent met with him on November 29 and then I met

 8    with him December 15th of 2010.  I have two notes that we

 9    recently found on the computer system that were drafted by

10    Mr. Hamer on December 20th, 2010.

11            And interestingly enough -- and we were unable to find

12    any other notes that had said this -- he was aware we were

13    looking.  So what does he do?  He writes a note for these two

14    patients, but he puts in there, four, five times, "Patient was

15    not present."  "Patient was not present."  "Patient was not

16    present."

17            Yet he adds that "Patient appeared at the group and

18    appeared anxious and depressed.  But I'm just telling you he

19    wasn't here," trying to again as a CYA measure say, "Okay.

20    Look.  I was forced to write this, but I'm still letting you

21    know, Government, if you come across this note, I wrote it

22    because I was told to do it, but the patient wasn't there."

23    This is not somebody who has learned any valuable lesson.

24            Again, Magistrate Judge White echoed this when he said

25    the thing that he found most disturbing is after meeting with

```
 1    the Government, you went back, committed fraud.  That's a big

 2    deal.

 3              In addition to that, your Honor, under the guideline

 4    of acceptance of responsibility, Section 3E1.1, it clearly

 5    states that the only way you get acceptance is if the Defendant

 6    clearly demonstrates acceptance of responsibility for his

 7    offense, which he has not.

 8              The notes to the application talk about what are the

 9    things the Court should consider.  Under 1(b):  voluntary

10    termination or withdrawal from criminal conduct or association.

11              It was the opposite in this case.

12              Under 1(f):  voluntary resignation from office or

13    position held during the commission of offense.

14              That didn't happen.

15              Obviously, the Commission took into account it's while

16    the crime is being committed, not after you're charged.  After

17    you're charged, you're arrested.  You're not going to continue

18    working at the same place after you've just been arrested for

19    the very conduct that you're being accused of.  So these are

20    things to consider.

21              In addition, your Honor, again, at Page 9 of the same

22    sentencing memorandum the Defendant filed, he talks about how

23    Mr. Jackson had admitted to the Government that approximately

24    90 percent of the patients that attended Biscayne Milieu did

25    not qualify for services.
```

1          And he states, "This is ridiculously untrue."

2          One thing that I would point out:  Again, Mr. Jackson,

3   who again accepted full responsibility and should receive the

4   benefit of accepting full responsibility, should not be treated

5   the same way as a defendant who says, "This isn't true.  This

6   never happened."

7          And I would submit to the Court that the way we know,

8   one, that it did happen is, one, what benefit is it for

9   Mr. Jackson to admit that he himself treated 90 percent of

10  patients that didn't qualify?  Why on earth would he say that,

11  knowing that that's incriminating him?  That's number one.

12         Number two, your Honor's aware how the patients were

13  brought to Biscayne.  They were recruited.  90 percent, even

14  possibly more than 90 percent, were brought by case managers.

15  And I put that in quotes, because all they were were glorified

16  patient recruiters.  They were not doctors; they were not

17  psychiatrists; they were paid for one purpose and one purpose

18  only:  to bring patients.

19         Although, as the saying goes, even a blind squirrel

20  finds a nut every once in a while, maybe one of those patients

21  out of the hundreds that they were recruiting maybe happened to

22  qualify.  It is highly unlikely when you set up a system based

23  on illegal kickback payments that the majority of the patients

24  are going to qualify.  They're not.

25         So again, he's taking issue with the fact that "What I

1  did wasn't so bad; and, by the way, 90 percent of the patients,

2  this statement by Mr. Jackson, is entirely untrue."

3  Your Honor, again, I reviewed the letters that were

4  submitted by the Defendant.  And while I can appreciate that

5  Mr. Hamer has very good friends, I'm sure -- and family that

6  love him and want to support him, the problem I have with the

7  letters -- and I read many of these.  I'm sure you have, too.

8  But the thing that jumped out at me with these letters that,

9  again, in my career as a prosecutor, I have not seen before, is

10  how often they would echo, "If he did it, it's not really his

11  fault.  If he made a mistake, it was innocent.  If he did these

12  things, it's because he's a military man.  He was ordered to do

13  so."

14  I happen to know a little bit about the military.  And

15  I know that even orders, if they're illegal orders, you don't

16  follow them.  In fact, every soldier is briefed on that.

17  So to say, "I was ordered to write notes for patients

18  not there, so I did it, you know.  Why hold me responsible or

19  hold me accountable for that?"  It's ludicrous.  It's

20  ludicrous, particularly when these letters talk about how he

21  was raised, he was raised with good moral character, to never

22  cheat, never lie, to never steal.

23  His actions were directly related to the stealing of

24  Medicare, which is taken very seriously not just by the

25  Government, but by nearly everyone, particularly given the

1    state of the Medicare program today.

2            And again, I know, for example, Judge Ungaro -- we

3    just did the judicial bench conference with her.  And I

4    personally have been in front of her on sentencings of

5    healthcare fraud cases.  She won't even give acceptance if the

6    Defendant does not fill out a financial affidavit.  And this

7    Defendant, although he was required to do so by the plea

8    agreement, has not yet filled out a financial affidavit.

9            I know the counterargument is going to be, "I didn't

10   make bank on this fraud."

11           And I agree with your Honor.  That is something to

12   consider.  But we already considered it.  Where did we consider

13   it?  In giving him minor role.

14           In fact, your Honor, that was a gift, because when you

15   consider what *De Varon* says in the Eleventh Circuit about what

16   minor role truly is and you think about this scheme, no, he

17   didn't come up with it, but he wasn't charged as a

18   leader/organizer either.  And no, he wasn't the one who made

19   the most money on this scheme.

20           But without him and without the other therapists to do

21   what they were being asked to do, this fraud can't occur,

22   because they need to have the appearance of legitimacy in order

23   for it to work.  And to have the appearance of legitimacy, they

24   need therapists there seeing patients, writing notes.  And that

25   is exactly what he did.  And he knew when he was doing it that

 1   he was lying.  He knew when he was doing it he was committing

 2   fraud.  But as one of the letters pointed out, these are tough

 3   economic times, so he needed the salary.

 4            If that were the standard, then everyone should just

 5   go out and commit fraud as soon as they lose their jobs.  And

 6   I -- believe me, I know plenty of people who would love to be

 7   making $56,000 a year doing what he did.  But they aren't given

 8   those opportunities.  And if they're given opportunities to

 9   commit fraud, they have the moral sense and good character just

10   to say, "No, I'm not going to do that," whereas this Defendant

11   did not.

12            So under the guidelines, your Honor -- and I did

13   obviously file my objection.  I went over it with Probation.

14   Probation agrees.  We don't always agree, but we did in this

15   instance.

16            And again, having gone through the letters, the memo,

17   the statements that he's made, the conduct of continuing it

18   even after he knew that there was an investigation of what he

19   was doing, it flies in the face of acceptance.

20            THE COURT:  Mr. Barzee, what is your response in terms

21   of acceptance?

22            MR. BARZEE:  Your Honor, I would just point out to the

23   Court that in his letter asking to withdraw the plea, he pretty

24   clearly indicates that the reason he wants to withdraw the plea

25   is because he believed that under the law of conspiracy, he's

26

1    not guilty because he didn't personally enrich himself.

2            As far as everything else, he admitted that he was

3    guilty and never claimed otherwise.

4            The factual proffer that was entered into the Court

5    that was written by the Government conditions each of his acts

6    with an explanation that he was doing it as instructed.  He

7    simply is repeating what the Government wrote in their factual

8    proffer.

9            And the final thing I'd like to note about the number

10   of people in the groups that were not able to -- that shouldn't

11   have been in the group, you know, when Ms. Shick sent over the

12   first plea agreement, it said that most of the patients in the

13   group were not supposed to be there.

14           And Mr. Hamer asked me to call Ms. Shick and inform

15   her that that was incorrect, and that it is true that many of

16   the patients probably shouldn't have been there because they

17   either had dementia or were actively using drugs and weren't

18   applicable for that group.

19           Ms. Shick agreed.

20           So the factual proffer before the Court indicates

21   that -- many people in the group, not most, and certainly not

22   90 percent.

23           That's all, your Honor.

24           THE COURT:  I find that the Defendant is entitled to

25   the acceptance of responsibility reduction, so I'm going to

```
1    give him three levels off.

2              So I find that the total offense level is a level 23,

3    criminal history category I, which calls for an advisory

4    guideline range provision of 46 to 57 months.

5              What is the Government's position as an appropriate

6    sentence, without repeating yourself?

7              MS. SHICK:  Your Honor, without repeating myself, I do

8    need to add that the Court has control over two points for

9    acceptance.

10             The Government is not making a motion for the third

11   point of acceptance for all the reasons that I stated

12   previously.

13             And then in dealing with the new guideline range,

14   which would be 51 to 63 months, your Honor --

15             THE COURT:  What is your recommendation?

16             MS. SHICK:  -- without repeating myself, your Honor,

17   quite simply, I think the Defendant should be sentenced to the

18   low end of the guideline range.  Obviously, we object to the

19   Court's findings with respect to acceptance.  But given the

20   Court's findings, we are recommending the low end, or 51

21   months.

22             THE COURT:  I'm looking at the acceptance of

23   responsibility, which is 3E1.1, Subsection B.  It says, "If the

24   Defendant qualifies for a decrease under Subsection A" --

25             MS. SHICK:  "Upon motion of the Government."  I
```

```
 1    apologize, your Honor.  I thought you were pausing.

 2              THE COURT:  I was pausing.  My pause doesn't mean I

 3    want audience participation.

 4              "If the Defendant qualifies for a decrease under

 5    Subsection A and it's more than a level 16, and upon motion of

 6    the Government stating that the Defendant has assisted

 7    authorities in the investigation or prosecution of his own

 8    misconduct by timely notifying authorities of his intention to

 9    enter a guilty plea, thereby permitting the Government to avoid

10    preparing for trial."

11              So your motion is really based upon his timely

12    notifying you, pleading guilty and avoiding your preparation.

13              MS. SHICK:  Well --

14              THE COURT:  So how can you not file that motion or

15    make that motion when he's done that, even if you disagree with

16    my legal finding as to Part A?

17              MS. SHICK:  I agree -- I disagree with your legal

18    findings on acceptance.

19              But the reason for the third point not being given in

20    this case is, this wasn't timely -- this wasn't somebody who

21    timely agreed to plead guilty.  He didn't plead guilty until

22    February.  We've done a lot of work, a lot more work than I

23    would anticipate doing for a plea or for a sentencing, your

24    Honor.

25              THE COURT:  So any other defendant when he pleads
```

1    guilty after he did is not going to get three levels?

2              MS. SHICK:  In fact, your Honor, there was a letter --

3              THE COURT:  Is that true?

4              MS. SHICK:  Yes.  There was a letter sent to

5    Mr. Barzee saying if he didn't plead by this date.  We had to

6    continue it because --

7              THE COURT:  Did he plead by that date?

8              MR. BARZEE:  I have to check what date I extended it

9    to for the letter, your Honor.

10             But to be honest with you, even after he had made a

11   motion to the Court to withdraw his plea, we again put him back

12   in the category of, He's going to trial; we're going to

13   continue to work to prove our case.

14             And it's a lot of work.  And I'm happy to have the

15   agents tell you all of the work that they've done to go through

16   and find notes and other items that Mr. Hamer's authored that

17   we would need to prove the case at trial.

18             And again, your Honor, the motion has to be made by

19   the Government.  And we're not making it.

20             THE COURT:  So your recommendation is 51 months?

21             MS. SHICK:  Correct, your Honor.

22             THE COURT:  Mr. Barzee, what is the Defendant's

23   position as to an appropriate sentence?

24             MR. BARZEE:  Your Honor, I believe that Mr. Hamer's

25   intention is to request a sentence of probation, and I believe

```
 1    that he has some witnesses that he would like to call.

 2              THE COURT:  Okay.

 3              MR. BARZEE:  Is that correct?

 4              THE DEFENDANT:  Yes, sir.

 5              THE COURT:  Are these people that didn't write a

 6    letter that are going to say something different than what's in

 7    their letters?

 8              MR. BARZEE:  Mr. Hamer, could you answer that

 9    question?

10              THE DEFENDANT:  Yes, your Honor.  I think that some

11    people wrote letters and some have things other to say than

12    what are in the letters.

13              THE COURT:  So go ahead.

14              MS. SHICK:  Your Honor, may I interject one moment?

15    The plea agreement that the Defendant signed specifically

16    prohibits him from making this motion for a variance in

17    Paragraph 10.  The Defendant signed it.  He acknowledged it.

18    So I just want to raise the issue with the Court.

19              THE COURT:  I'm just going to hear from people.

20    Nobody's made a motion for a variance.

21              So tell me what person you want to call first.

22              MR. BARZEE:  Your Honor, the first person that

23    Mr. Hamer would like to call is Dawn Kirk, who has been

24    described to me as a former student of Mr. Hamer's and an Air

25    Force veteran.  She would like to address the Court, with the
```

```
 1    Court's permission.

 2              THE COURT:  Okay.

 3              MR. BARZEE:  Go ahead.  Stand at the podium.

 4              MS. KIRK:  Good afternoon, your Honor.

 5              My husband and I first met Professor Hamer over a

 6    couple years ago.  I was attending City College in

 7    Ft. Lauderdale.  Professor Hamer was my psychology teacher.

 8              He was in my opinion by far one of the most

 9    influential professors at City College.  His way of teaching

10    was more than just a teacher teaching at a classroom.  He

11    influenced his students.

12              He cared about them and their future.  Through his

13    methods of teaching, you wanted to understand not just the

14    material that he was teaching on a blackboard, but the

15    consequences of things that you could do in life and where that

16    journey was going to go.

17              Time and time again, Mr. Hamer would stay after class

18    or even get to school early, even leaving his other job, just

19    so that he could mentor and help other students prepare for

20    college and graduate from college.

21              His acts of caring and giving of himself time and time

22    again made a profound impact on my life.

23              And I don't know about everything that's been going

24    on.  But I know what he has been to me.  And he has helped me

25    more ways than I can ever imagine.
```

1          I truly, truly think and believe that he is sorry for

2     everything he's ever done and made mistakes, like everybody

3     else.  His warmth and compassion for life and the caring of his

4     students and everything he's done has impacted me by doing the

5     same and helping and influencing students, former students,

6     tutoring, mentoring, because of him and his acts.

7          No matter where he goes or how unfortunate the

8     circumstance may be, I believe Mr. Hamer will always make a

9     positive and profound impact on other people's lives and

10    everybody else around him.

11         And I just wanted to say that to you as a former

12    student of his for the kind of impact that he had on my life.

13         THE COURT:  Thank you.

14         MS. KIRK:  Thank you.

15         THE COURT:  Who else?

16         THE DEFENDANT:  Professor Carrington.  Professor

17    Carrington has been a friend of mine for somewhere between 15

18    and 20 years, your Honor.  We've lost count.

19         MR. CARRINGTON:  Good afternoon, sir.

20         I'm just going to introduce myself so that you have a

21    little background on me as it will relate to Mr. Hamer.

22         I graduated Harvard University in 1985, with

23    certifications in psychological assessments and psychometry and

24    a few other things.

25         I've been a licensed medical nutritionist under the

1   State of Florida since they started licensing, somewhere back

2   in the 1980s.  I'm retired now.

3          Mr. Hamer and I met when I was giving a lecture on

4   Alzheimer's disease.  And he questioned me afterwards on a

5   number of things and had a lot of really good questions.  We

6   became friends.

7          He has -- in my life, I have never had anybody help me

8   more when I needed help than he has.  I'm going to give you two

9   examples.  Once, I was coming down from New York on a case that

10   I had to attend and my car broke down in South Carolina.  I had

11   lost my wallet.  I called him.  He gave the credit card number

12   over the phone and I was able to get a new transmission.

13          My mother had a situation -- she's 95 years old, and

14   she had a situation where somebody had tricked her into signing

15   documents that put her into a home against her will.

16          I told Tom about that.  And I had exhausted over

17   $100,000 of legal fees to try to get lawyers to get my mother

18   home.  I ran out of money, and I told him.  He came up with

19   more money.  And I didn't know it at the time, but I later

20   found out that he had mortgaged his house to help my mother.

21   And he did not even know her, and he mortgaged his house for

22   her.

23          He's been -- because of my field in medicine, he's

24   been a patient of mine over the years.  And when I saw what was

25   happening to him the last year or two -- we used to go to

1    movies every Saturday night for a number of years.  He was a

2    movie buddy.  Then all of a sudden for about the last year or

3    two, he couldn't go to movies anymore.

4              I said, "What's going on?"

5              He said, "Look, man.  I've got notes.  I'm buried in

6    notes.  They're giving me more and more notes to do."  The

7    windup is, we didn't go for about the last year and a half

8    because he was constantly writing notes.

9              I said, "This is not right, Tom.  There's something

10   wrong.  How much sleep are you getting?"

11             He said, "Four hours a night."

12             I said, "You're not looking good.  Let me do some

13   blood tests."  I did, and I saw his liver enzymes were very

14   high because he started drinking because of the incredible

15   pressure that he was under on his job.  He had no life anymore.

16   He just did notes seven days a week.

17             As everything unfolded -- this is just my own view,

18   but as everything began to unfold and I learned what later on

19   happened, I began to think to myself, I think that he's

20   deliberately being overloaded with so many notes and deprived

21   of sleep that he can't possibly keep up with what's going on.

22             And I think he was being predisposed or set up so that

23   when something came along that they needed him to sign off on,

24   he just signs off on it.  You just can't handle all of this

25   volume with all of this sleep.

```
 1              THE COURT:  That's not a good argument to help me
 2    decide what a fair sentence is.
 3              MR. CARRINGTON:  I'm saying what I know, sir.
 4              I guess --
 5              THE COURT:  You don't know, because you weren't there.
 6    This is a sentencing.  It's not a trial to prove his innocence.
 7    He's already admitted he's guilty.
 8              You want me to give a sentence that's less than 51
 9    months.  Then tell me things like you told me about helping
10    your mom.  That was -- that's something that would help me
11    decide an appropriate sentence for somebody who has committed a
12    crime.  Trying to come up with some convoluted explanation of
13    how he really didn't do it is not helping him and it's not
14    helping me.
15              MR. CARRINGTON:  I didn't mean that he didn't do it,
16    sir.  I thought he was terribly, terribly naive.
17              Let me just finish with one more point.
18              In addition to helping me on numerous occasions, I
19    knew someone that was recently widowed who was also very, very
20    ill.  And she lived in a home.  She had nobody taking care of
21    her home.  And as soon as Tom knew about this, he went there
22    and he immediately started doing repairs.  I know her sink was
23    backed up.  He came over with a machine and undid her sink.  It
24    took him half a day.  I helped him.
25              Another time, her toilet was gone.  Her roof was
```

 1    leaking.  Tom was always there, fixing this widow's home.  He
 2    never got paid for it.
 3         I know so many examples like this.  He's just a
 4    terribly naive person with a very good heart.  And all I know
 5    from him is that he has always been there for everybody to help
 6    people when they needed help.  And he's -- I know he's never
 7    even had a speeding ticket.  He's always been very respectful
 8    of the law, not a speeding ticket, not a parking ticket,
 9    nothing, because that's just the way he is.
10         He's a very trusting person.  I think he's been used
11    many times and taken advantage of.  And I think this is one of
12    those times.
13         So -- I can go on.  But not everything I say may be
14    relevant.
15         So I'll just say that I beg this Court from my heart
16    and from my soul for someone who has just done so much good for
17    so many people to have mercy on him.  He's not a bad guy.  In
18    some ways, he's stupid and naive.  I think this is one of those
19    times.  Just please have mercy on this man.  He's a very, very
20    good man.  I've been proud to be his friend and proud to stand
21    here today and speak for him.
22         God bless you, and thank you for the privilege of
23    speaking.
24              THE COURT:  Thank you.
25              THE DEFENDANT:  This is Mrs. Beverly Wilkinson.  She's

1   a social worker and a former colleague.

2           THE COURT:  Thank you.

3           MR. WILKINSON:  Good afternoon, your Honor.

4           I've been a social worker for eight years, and I've

5   known Mr. Hamer that long.  We met while we were working as

6   therapists together at Camelot Community Care.

7           I just would like to point out two things today.  One

8   is that nobody goes into the field of social service with the

9   thought of making a lot of money for themselves, especially

10  when you study this field later in life.  By then, you know a

11  little bit more about what you can expect to earn from various

12  occupations.

13          Mr. Hamer went to a private university.  He knew that

14  that would involve a lot of hard work, long hours of study and

15  of course financial burdens.  And, once graduated, the long

16  hours and financial sacrifices continue in this field.

17          So those that enter the field and stay in it for the

18  long haul really have only one motivation:  They want to help

19  people.

20          And the desire to help others is not something that

21  you can learn in school.  It has to be in your heart before you

22  even get accepted.

23          And the desire to help people is definitely in

24  Mr. Hamer's heart.

25          My second point is just that:  that he has been a

1  kind -- that he has a kind and compassionate heart.  I have

2  seen him in action both on the job and in his personal life.

3  When we ran groups together at Camelot Community Care, we

4  worked with therapeutic foster teams.  And these were tough

5  kids.  But Mr. Hamer always saw the best in them and he had

6  encouragement for them and their foster parents.  He was well

7  liked by the foster parents because the team boys listened to

8  him and looked up to him.

9         In his personal life, Mr. Hamer was always willing to

10  help others.  When Hurricane Wilma struck, he knew that my baby

11  granddaughter was living in my home with me.  And both of our

12  homes were -- had no electricity for three weeks at a time.

13         And he told coworkers that he had a solar panel in his

14  house so that he had warm water and people could come and take

15  showers.  So even though he had very little in the midst of

16  this hurricane, he opened his own home to others to help them

17  out, and so anyone could come and take a shower.

18         I was touched that Mr. Hamer opened his home to my

19  baby granddaughter so I could give her a warm shower and not

20  have to thrust her into the cold water.  I thought it was a

21  very thoughtful gesture for a child that he barely knew.

22         And he's helped my family on many occasions in other

23  ways.  I've always known him to be caring and compassionate

24  with both the clients he was assigned to work with and also he

25  tried new ways to reach the children.  And I just always saw

1    him as being looking out for others and looking for ways to

2    help others.

3              Thank you.

4              THE COURT:  Thank you.

5              THE DEFENDANT:  I'd like you to hear from the people

6    representing my church, your Honor.

7              This is Tron LaFaveur.  His father is the pastor.

8    Tron's recently become an elder.

9              THE COURT:  Okay.

10             THE DEFENDANT:  He's also recently become a licensed

11   marriage and family therapist.  And I think he's tell you how

12   that came about.

13             MR. LAFAVEUR:  Thank you.

14             Hello, your Honor.  As Tom already indicated, my name

15   is Tron LaFaveur.  And Thomas currently attends my place of

16   worship.  I've known him for about seven or more years.

17             And during his time at the ministry where my father

18   has been the pastor for 32 years, he has had a positive impact

19   on the lives of the members as well as myself.

20             Also, while being at the ministry, he's been able to

21   assist with the elderly.  He's also been able to present

22   various seminars and to enhance relationships.  And he has also

23   on occasion even transported members who may have needed

24   transportation home who did not have a ride.

25             How Thomas has impacted my life:  During the time of

```
 1    attendance at the ministry, he came to me and he talked about

 2    the importance of becoming a therapist because he believed that

 3    that would be a good fit for me in the ministry, that would be

 4    a help to what I needed to enhance the lives of not only the

 5    members, but even outside of the congregation.  So he told me,

 6    "Maybe you should look into the field of marriage and family

 7    therapy."

 8             From that, I was able to enter the marriage and family

 9    program at Nova Southeastern University and I was able to

10    successfully receive my master's degree after marriage and

11    family therapy.

12             From that, I was able to go on and receive my license

13    as a marriage and family therapist.

14             In addition to that, I was able to also further my

15    studies and pursue currently my Ph.D. in marriage and family

16    therapy.

17             But I just want to highlight, you know, since the time

18    I've known Tom, he's been a real good person and he really has

19    had a positive impact on my life and also the lives of the

20    members at the church.  And from his assistance and his

21    guidance, I've been able to help a lot of people.

22             Currently, I work as a supervisor of an intensive

23    in-home therapy.  I'm able to utilize some of the skills and

24    resources that -- that I have received as a result of his

25    guidance in pursuing the degree in marriage and family therapy.
```

1           So I just wanted to, you know, speak as a character

2    reference to the type of man that Thomas has been and how he

3    has impacted my life in a positive way.

4           So thank you, your Honor, for affording me the

5    opportunity to speak.

6           THE COURT:  Thank you.

7           THE DEFENDANT:  Your Honor, Mr. Mark Boxtein, Esquire.

8           MR. BARZEE:  This is the last one, your Honor.

9           MR. BOXTEIN:  Good afternoon, Judge.  Thank you for

10   the opportunity to speak.

11          I'm privileged to speak on behalf of Thomas Hamer.

12   I've known him for approximately 15 years.

13          I had a near-death experience in my life.  And we have

14   a meeting the first Friday of every month.  And for the 15

15   years that I've been going, Tom goes as well.  What happens at

16   those meetings is, people that have near-death experiences come

17   back, see another part of reality that confuses them; and he's

18   voluntarily spent his time helping people come back into this

19   world and makes transition easier for them.

20          He's a terrific man.  Not anybody just comes and does

21   that on their own.

22          He's also certainly no threat to society.  He

23   certainly is no threat to do this again.  He spent four and a

24   half months in jail in this case because he couldn't bond out.

25   Obviously, his employers were the primary targets here, not

1    him.

2              As you know, sometimes good people wind up making

3    wrong choices.  Obviously, what's happened -- and his whole

4    life has been turned around.  He's in the process of losing his

5    home.  If he goes to jail, he's going to lose it.

6              As far as punishment is concerned, I know you don't

7    want to hear that from me.  But I believe that he's been

8    punished enough.  He's a good man.  We would ask you to give

9    him the minimum that you can possibly give him.

10             Once again, I thank you for letting me speak on his

11   behalf.  He's never spent a day in jail, never was even

12   arrested before this happened.  I think from your questions to

13   the prosecutor, you see exactly what happened here.  And I

14   thank you for your attention and I ask you to be as lenient as

15   you can possibly be.

16             Thank you very much.

17             THE COURT:  Thank you.

18             MR. BARZEE:  Your Honor, Mr. Hamer would like to

19   address the Court at this time.

20             THE COURT:  All right.  Go ahead, Mr. Hamer.

21             THE DEFENDANT:  Good afternoon, your Honor.

22             I thank you very much for the opportunity to address

23   the Court.  I had no idea coming in today that Mrs. Shick would

24   be saying some of the things that she said.

25             THE COURT:  Don't -- you don't need to be a lawyer to

1    argue against Ms. Shick.  You need to tell me something good

2    about your life, something good about you, to convince me why I

3    should give you a sentence of less than 51 months.  That's what

4    I need.

5            If you need to criticize her, you can send her letters

6    for the next 51 months you're in prison.  Okay?  If you want to

7    get less than 51 months, then tell me why, compared to all the

8    other defendants who are charged with a crime like this, you

9    should get less time than they did.

10           THE DEFENDANT:  Your Honor, I'm not saying I should

11   get less time than they.

12           I am saying something that will probably shock this

13   Court.  If I had to do it all over again, I would do at least

14   90 percent exactly the same way, because I had the opportunity

15   to work with some of the scum of the earth, some of the dregs

16   of our society, people who were not only addicts, but they had

17   psychological problems as well.  And every one of them that

18   came before me had a proper diagnosis from a psychiatrist and

19   they had a drug problem or generally just a diagnosis.

20           I worked with these people because I saw in them

21   something I think most people did not and I give them something

22   they generally didn't get, and that was hope.  They got

23   self-esteem.

24           I saw families reunited; I saw lives saved; I had

25   patients that I would have sworn had Alzheimer's and I worked

```
 1    with them and worked with them, and it turned out they turned

 2    into something quite different.

 3              You have the problem of drugs, which is bad enough,

 4    tearing apart our society.  You have psychiatric diagnoses.

 5    And I can tell you, your Honor, with 100 addicts, you're going

 6    to have at least 50 of them with major psych problems, probably

 7    higher.

 8              THE COURT:  Okay.  So I can see what you say:  "I

 9    would like to help people like that.  I would do that again."

10              THE DEFENDANT:  I would like to.

11              THE COURT:  You would like to help them in a way where

12    people are ripping off Medicare to get paid for you to help

13    these people?

14              THE DEFENDANT:  Your Honor, I can only say that for

15    me, it was a privilege to help those people.  I will tell you

16    that.

17              I would also like to say that --

18              THE COURT:  Well, do you have any thoughts about the

19    millions of dollars that I and everybody else in this courtroom

20    paid through taxes -- that we paid to -- for the people who

21    were running this to pay your salary?

22              THE DEFENDANT:  Yes, sir.  If I had thought even after

23    meeting with these agents who used the words to describe the

24    place as a criminal enterprise, I did not see that, because I

25    saw ill, suffering people every day.  And I helped them to the
```

1    best of my ability.

2            And I am not saying that I am perfect.  I am

3    definitely not saying that.  I am not saying I am an angel,

4    your Honor.  But I am saying that me -- that I and my fellow

5    therapists were fighting on the side of the angels to reduce

6    the use of drugs, particularly under this incredibly vulnerable

7    segment of our society where they already had psychiatric

8    disorders.

9            One of the patients in question, A.W., said, "My

10   psychiatric drugs don't work anymore, but cocaine works great."

11   And that's why she was a cocaine addict.  She was physically

12   ill.  She came to the facility four times before finally being

13   admitted.  Four times.

14           So they could have written four IPEs, but they did

15   not, not until she was properly admitted and she came to me.

16           So I did not see this vast criminal conspiracy.  And

17   I --

18           THE COURT:  Do you see it now?

19           THE DEFENDANT:  No, sir.  I saw errors.  I saw

20   mistakes.  I saw -- we had a new supervisor who came in who

21   said, "We're not going to permit any of this stuff."  The case

22   managers were responsible for taking care of these patients,

23   not just recruiting them.

24           So I'm sorry if it shocks the conscience of the Court

25   for me to say, "You know what, your Honor?  I saw really good

 1    things.  And I did really good things.  And I would continue."

 2            Wherever you send me, I will find somebody who needs

 3    help and I will help them.  I've already done that for four

 4    months in the Federal Detention Center.  It wasn't fun.  But

 5    there was a man who needed my help.

 6            So from the very first, when I went to the FBI, I gave

 7    them all the information that I knew, which was that patients

 8    were getting paid to come to group.  And that was an insult to

 9    me, because I want people coming to groups because they want to

10    get better, not because they're getting paid to be there.

11            At one point, I had a group knowing I was going to be

12    the therapist applaud.  They applauded.  They might have been

13    getting paid to be there, but they didn't get paid to applaud.

14    That's very rare.

15            I provided the agents with examples of documents so

16    they could understand how we did our jobs.  The second time,

17    they didn't know the difference between a group patient and an

18    individual patient.  I gave them everything I knew, both good

19    and bad.

20            I was told when I asked Mr. McGinty after the first

21    meeting -- I said, "Should I quit my job?"

22            He said, "No.  No."  He said, "Go back to work.  We'll

23    be in touch."

24            That was on 11-29, a rainy Monday night after

25    Thanksgiving, the first Monday after Thanksgiving.

1          I did not know I could have a lawyer at government

2     expense.

3          I was told when I first met Mr. McGinty, "Would you

4     like immunity?"

5          I said, "No.  I haven't done anything wrong."

6          They said, "Would you like to have a lawyer?"

7          I said, "I can't afford one," which by the way is

8     still the case.

9          When I spoke with Mr. McGinty on the phone, he said,

10    "It will be better for you if you meet with the assistant US

11    Attorney."

12          THE COURT:  You're getting into these arguments that

13    have nothing to do with why I should give you a low sentence.

14    I really came here today with a goal of giving you a low

15    sentence, and you are doing everything you can to change the

16    goal here.

17          THE DEFENDANT:  I'm trying not to, your Honor.  I'm

18    trying to say, from my heart, I did the best I could with the

19    patients I had.

20          Did I make mistakes?  Yes, I did.

21          THE COURT:  You say things like, "Even today, I would

22    do it again."

23          THE DEFENDANT:  No, sir.  I said --

24          THE COURT:  I thought maybe you would do only the part

25    about helping people without doing Medicare fraud.

1              And I said, "Even knowing what you know today, you

2       would still do it?"

3              "Yes."

4              What kind of thing is that to say?

5              THE DEFENDANT:  Your Honor, what I said was, I would

6       do what I did with my patients.  That I would do, because I

7       helped them.

8              THE COURT:  But you were working at a place where the

9       people running it are getting paid millions of dollars so --

10      from Medicare that they don't deserve so you could have your

11      patients.  You would do that again?

12             THE DEFENDANT:  No, your Honor, because I didn't know

13      about that.  I never knew.

14             I came to work six days a week, got paid for five.  I

15      got an average from the hours I worked of 18 bucks an hour.

16      That's not unjust enrichment.

17             But I will tell you, I was nevertheless enriched by

18      doing what I did for the patients that I had.

19             I'm not trying to frustrate your Honor.  I am not.

20             I am saying that if --

21             THE COURT:  I know you may not be trying to, but,

22      trust me, you are.  The hardest thing for me to do is send

23      somebody to prison.  And I have to do it all the time.

24             That's the -- when I was a state court judge, I didn't

25      do it that often.  But here, you know, we hand out prison

```
 1    sentences like they are after-dinner mints.  I don't like doing

 2    it.  I do it.  That's my job.

 3              THE DEFENDANT:  I understand, your Honor.  I am

 4    absolutely --

 5              THE COURT:  I'm trying to figure out a way to help you

 6    out in spite of yourself.

 7              THE DEFENDANT:  Yes, sir.  I've noticed that.  I

 8    appreciate it, too.

 9         I am absolutely remorseful for any wrong that I've

10    done, your Honor.  And I know I made mistakes.  I know I made

11    bad decisions.  I can only tell you my intentions were to help

12    my patients.

13              That's it.  And I'm really proud that I did so.

14              If you could have taken a survey of our patients, they

15    would have said almost universally, whether I was their third

16    therapist or not, "Mr. Hamer helped me.  When we had group with

17    Mr. Hamer, I knew we were going to get something out of it."

18              I gave what I could, your Honor.  I worked two jobs,

19    seven days a week.  I tried to help out one of my colleagues.

20    It didn't go too well.

21              THE COURT:  Anything else you want to say?

22              THE DEFENDANT:  Yes, your Honor.

23              Thank you very, very much, because I see you're a man

24    of compassion.  And compassion is what I had for my patients.

25    And sometimes they're pretty hard to be compassionate about,
```

```
 1    I've got to tell you:  thieves, rascals, liars.  But I
 2    can only--
 3              THE COURT:  Therapists who were going to get a low
 4    sentence and they're talking themselves out of it?
 5              I'm going to take a five-minute break.
 6              THE DEFENDANT:  Thank you, your Honor.
 7              (Thereupon a recess was taken, after which the
 8    following proceedings were had:)
 9              THE COURT:  Thank you.  Be seated.
10              Mr. Hamer, I don't want to make you think that I was
11    trying to cut you off.  If there's anything else you want to
12    say, I'll hear from you, if you want to say anything else.
13              THE DEFENDANT:  Yes, your Honor.
14              THE COURT:  Okay.  You know the comedian Ron White?
15    He used to say, "I knew I had the right to remain silent, but I
16    just didn't have the ability."
17              Go ahead.
18              THE DEFENDANT:  I am terribly, terribly sorry for the
19    mistakes that I made and for overlooking things that I
20    overlooked that I shouldn't have.  I am truly remorseful for
21    that, because I think I've thrown away my career and the
22    opportunity to help others.  But I am from the bottom of my
23    heart -- I accept complete responsibility for my screw-ups,
24    including the letter to your Honor.
25              I want to apologize to Mr. Barzee.  He was right in a
```

1    whole lot of ways I didn't understand.

2            And I want to thank your Honor for listening to me.

3    Like I said, I might not have the good sense, but I do have a

4    good heart.

5            THE COURT:  Thank you.

6            After considering the statements of the parties, the

7    presentence reports and all the statutory factors and

8    considering that the total offense level is 24 with a criminal

9    history category I for an advisory guideline range of 51 to 63

10   months, the Court must fashion a sentence that is sufficient

11   but not greater than necessary to reflect the seriousness of

12   the offense, just punishment, adequate deterrence to the

13   Defendant and others and to protect the public from further

14   crimes of the Defendant.

15           I find that a sentence within the advisory guideline

16   range is greater than necessary to accomplish those goals of

17   sentencing.

18           I feel that when I sentence somebody I really want to

19   look on their entire lifetime of contributions, good and bad,

20   and what they did in this case and what's really necessary.

21   The last hour and a half have made it a lot more difficult for

22   me to do that.  But I really don't think somebody should get

23   extra time in prison because they can't keep their mouth shut.

24           I think if you're looking back upon Mr. Hamer's life

25   of 62 years, without having any other criminal activity, the

1   fact that he served honorably in our military, all the other

2   good deeds we heard about from his friends and coworkers and

3   colleagues, it is the judgment of the Court that the Defendant

4   is sentenced to 24 months' imprisonment as to Count 1.

5         I'm going to further order that he pay his restitution

6   in the amount of $6,298,549, for which he will be jointly and

7   severally liable with his Co-Defendants.

8         While he is incarcerated, he shall pay either 50

9   percent of his earnings if he works in Unicor, or $25 per

10   quarter if he does not have a Unicor job.

11         And upon his release from incarceration, he'll pay

12   restitution at the rate of 10 percent of his gross monthly

13   earnings unless the Court alters that payment schedule.

14         The restitution shall be payable to the United States

15   Clerk's Office, Financial Section, 400 North Miami Avenue, Room

16   9N09, Miami, Florida 33128.

17         Upon his release from prison, the Defendant will be

18   placed on three years of supervised release.

19         Within 72 hours of his release, he'll report in person

20   to the probation office in the district where released.

21         While on release, in addition to the standard

22   conditions of supervised release, he will undergo substance

23   abuse treatment.

24         And the financial disclosure requirement, the

25   no-new-debt restriction, the employment requirement,

1    self-employment restriction, permissible search and healthcare

2    business restrictions, all noted in Part G of the presentence

3    investigation report, will apply to him.

4           I'm also going to order that he pay a special

5    assessment of $100 to the United States immediately.

6           Based upon his financial condition, I don't believe he

7    has the ability to pay a fine, so I'm not going to impose a

8    fine.

9           So the total sentence is 24 months in prison,

10    $6,298,549 in restitution, three years of supervised release

11    and a $100 special assessment.

12           I'm going to order forfeiture of the Defendant's

13    right, title and interest in the property as consistent with

14    the plea agreement.  And the Government will submit a proposed

15    order of forfeiture within three days of this proceeding.

16           I will allow the Defendant to voluntarily surrender at

17    the institution that he's assigned on July 27th at 9:00 a.m.

18    If for some reason he has not heard from his institution or

19    from the Bureau of Prisons by then, he will surrender in open

20    court in this courtroom on July 27 at 9:00 a.m.

21           Now that sentence has been imposed, does the Defendant

22    or his counsel object to the Court's finding of fact or the

23    manner in which sentence was pronounced?

24           MR. BARZEE:  Your Honor, no objections.

25           We have two requests to make.

```
 1              THE COURT:  Okay.

 2              MR. BARZEE:  Your Honor, the first request is that the

 3  Court consider recommending the 500-hour drug and alcohol

 4  program.

 5              The second request is for a sentencing location -- his

 6  sister lives in Southern Tennessee; so he was asking for a

 7  recommendation of Montgomery, Alabama; Pensacola, Florida; or

 8  Talladega, Alabama.

 9              THE COURT:  Are those institutions that would be

10  consistent with the level of prison --

11              MR. BARZEE:  I believe so, sir.

12              THE COURT:  -- based on the length of sentence?

13              MR. BARZEE:  I believe so.

14              THE COURT:  I'll also recommend that while he is in

15  custody he participates in the 500-hour drug and alcohol

16  treatment, that he be allowed to serve a sentence as near as

17  possible to Southern Tennessee.  And I'll specifically

18  recommend Montgomery, Pensacola or Talladega.

19              All right, Mr. Hamer.  You have the right to appeal

20  your sentence.  Any notice of appeal must be filed within 14

21  days after the entry of the judgment.  If you're unable to pay

22  the cost of an appeal, you may apply for leave to appeal *in

23  forma pauperis*.

24              Anything further from the Government or the defense?

25              MS. SHICK:  Your Honor, the Government objects to the
```

```
 1   variance.
 2           There was an appellate waiver on the plea agreement,
 3   but the Court had already gone over that at the change of plea
 4   colloquy.
 5           THE COURT:  Thank you.
 6           MR. BARZEE:  Your Honor, just one bookkeeping point.
 7           If Mr. Hamer does intend to appeal, he's going to
 8   request that the Court appoint different counsel for purposes
 9   of appeal.
10           I don't know if the Court wants to consider that at
11   this time or sometime later.
12           THE COURT:  Under his plea agreement he can only -- I
13   did not sentence him beyond the statutory maximum.  I did not
14   sentence him above the guidelines.  So therefore, the only way
15   he could appeal is if the Government also appeals --
16           MR. BARZEE:  That's my understanding.
17           THE COURT:  -- or first appeals.  So the Government
18   would have to first appeal and then he would have to file a
19   cross-appeal.  Is that correct?
20           MR. BARZEE:  Yes.  I believe --
21           THE COURT:  He has 14 days to appeal.  He doesn't have
22   a right to appeal unless you appeal.  What if you appeal at
23   4:59 on the 14th day, which would then for the first time let
24   him know, "Okay.  Now I can appeal"?  Does his time period to
25   appeal then expire?  Does he have to file a notice, and then if
```

1  you don't appeal he withdraws it?  How do we make sure that

2  doesn't happen?

3          MS. SHICK:  I've never had this situation -- that

4  situation come up, your Honor.  But I agree with the Court.  I

5  don't think that it would be fair to the Defendant if we

6  appealed on the 14th day at 5:00 p.m.  I think that his time to

7  be allowed to cross-appeal should be extended.

8          But I don't -- your Honor, at this point, I don't make

9  the decision whether to appeal the Court's sentence.  That's a

10  higher pay grade than me.  So although we object to the

11  variance, because the Court had stated you're going to sentence

12  within the advisory guideline range, but obviously you chose to

13  vary, I'd have to talk to the office and see if they intend to

14  appeal or not.  That I don't know.

15          THE COURT:  The guideline range was 51 to 62 months.

16  I sentenced him to 24 months.  What would his appeal be?  That

17  I didn't vary enough?

18          MR. BARZEE:  I have no idea what his appeal would be,

19  your Honor.

20          THE COURT:  You know what?  I'm not going to give any

21  advice, because I don't want to say, "Wait until the Government

22  appeals and then you appeal," and then have the appellate court

23  say, "This is jurisdictional.  You lose your right to appeal."

24          So you have 14 days to appeal.  That's my advice to

25  you.

1          Thank you.

2          MS. SHICK:  Thank you, your Honor.

3          THE DEFENDANT:  Thank you, your Honor.

4          (Proceedings concluded.)

5                    C E R T I F I C A T E

6

7          I hereby certify that the foregoing is an

8    accurate transcription of the proceedings in the

9    above-entitled matter.

10

11
                              /s/Lisa Edwards
12    _____          LISA EDWARDS, CRR, RMR
          DATE              Official United States Court Reporter
13                          400 North Miami Avenue, Twelfth Floor
                            Miami, Florida 33128
14                          (305) 523-5499

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 53:5, 53:11
**$100,000** [1] - 33:17
**$25** [1] - 52:9
**$56,000** [1] - 25:7
**$6,298,549** [2] - 52:6, 53:10

## /

**/s/Lisa** [1] - 57:11

## 1

**1** [2] - 1:8, 52:4
**1(b** [1] - 21:9
**1(f** [1] - 21:12
**10** [2] - 30:17, 52:12
**100** [1] - 44:5
**11** [1] - 1:5
**11-20587-CRIMINAL-SCOLA** [1] - 1:2
**11-29** [1] - 46:24
**14** [3] - 54:20, 55:21, 56:24
**14th** [1] - 55:23, 56:6
**15** [3] - 32:17, 41:12, 41:14
**15th** [1] - 20:8
**16** [2] - 15:11, 28:5
**18** [1] - 48:15
**1980s** [1] - 33:2
**1985** [1] - 32:22

## 2

**20** [1] - 32:18
**2010** [2] - 20:8, 20:10
**2012** [1] - 1:5
**20th** [1] - 20:10
**23** [1] - 27:2
**24** [4] - 51:8, 52:4, 53:9, 56:16
**27** [1] - 53:20
**27th** [1] - 53:17
**29** [1] - 20:7
**2:07** [1] - 1:6

## 3

**3** [1] - 12:19
**302s** [1] - 19:7
**305** [2] - 1:24, 57:14
**32** [1] - 39:18

**33128** [4] - 1:19, 1:24, 52:16, 57:13
**33132** [1] - 1:16
**35** [1] - 12:5
**36** [2] - 3:13, 8:10
**3:28** [1] - 1:6
**3E1.1** [2] - 21:4, 27:23

## 4

**40** [1] - 1:18
**400** [3] - 1:23, 52:15, 57:13
**46** [1] - 27:4
**4:59** [1] - 55:23

## 5

**50** [2] - 44:6, 52:8
**500-hour** [2] - 54:3, 54:15
**51** [9] - 27:14, 27:20, 29:20, 35:8, 43:3, 43:6, 43:7, 51:9, 56:15
**523-5499** [2] - 1:24, 57:14
**552** [1] - 9:15
**57** [1] - 27:4
**5:00** [1] - 56:6
**5K** [1] - 12:5

## 6

**62** [2] - 51:25, 56:15
**63** [3] - 8:23, 27:14, 51:9

## 7

**7** [2] - 11:19, 12:19
**71** [1] - 8:14
**72** [1] - 52:19
**75** [1] - 8:14
**78** [1] - 8:23
**79** [1] - 8:14

## 8

**8** [1] - 13:10
**89** [1] - 8:14

## 9

**9** [3] - 13:19, 14:4,

21:21
**90** [7] - 21:24, 22:9, 22:13, 22:14, 23:1, 26:22, 43:14
**95** [1] - 33:13
**97** [1] - 12:4
**99** [1] - 1:15
**9:00** [2] - 53:17, 53:20
**9N09** [1] - 52:16

## A

**a.m** [2] - 53:17, 53:20
**A.W** [1] - 45:9
**ability** [3] - 45:1, 50:16, 53:7
**able** [10] - 26:10, 33:12, 39:20, 39:21, 40:8, 40:9, 40:12, 40:14, 40:21, 40:23
**above-entitled** [1] - 57:9
**absolutely** [3] - 19:14, 49:4, 49:9
**abuse** [1] - 52:23
**accept** [2] - 12:12, 50:23
**acceptance** [28] - 7:10, 8:16, 8:18, 8:23, 9:2, 9:3, 9:11, 9:21, 9:22, 11:11, 12:9, 12:10, 13:16, 14:13, 15:3, 15:19, 21:4, 21:5, 21:6, 24:5, 25:19, 25:21, 26:25, 27:9, 27:11, 27:19, 27:22, 28:18
**accepted** [2] - 22:3, 37:22
**accepting** [2] - 15:4, 22:4
**accomplish** [1] - 51:16
**account** [2] - 16:5, 21:15
**accountable** [1] - 23:19
**accurate** [2] - 13:22, 57:8
**accused** [1] - 21:19
**acknowledged** [1] - 30:17
**acknowledges** [1] - 7:5
**action** [1] - 38:2
**actions** [1] - 23:23
**actively** [1] - 26:17
**activities** [2] - 8:24,

10:9
**activity** [1] - 51:25
**acts** [4] - 10:24, 26:5, 31:21, 32:6
**add** [2] - 11:4, 27:8
**addict** [1] - 45:11
**addicts** [2] - 43:16, 44:5
**addition** [5] - 21:3, 21:21, 35:18, 40:14, 52:21
**additional** [1] - 3:23
**additionally** [1] - 6:16
**address** [6] - 7:9, 13:3, 16:11, 30:25, 42:19, 42:22
**addressing** [2] - 7:10, 8:19
**adds** [1] - 20:17
**adequate** [1] - 51:12
**administration** [1] - 14:5
**admission** [1] - 8:5
**admit** [3] - 6:25, 18:15, 22:9
**admitted** [13] - 5:17, 6:9, 6:19, 7:20, 12:7, 15:17, 15:21, 18:8, 21:23, 26:2, 35:7, 45:13, 45:15
**admitting** [1] - 14:20
**advantage** [1] - 36:11
**advice** [2] - 56:21, 56:24
**advisory** [4] - 27:3, 51:9, 51:15, 56:12
**affect** [1] - 3:7
**affidavit** [2] - 24:6, 24:8
**afford** [1] - 47:7
**affording** [1] - 41:4
**afield** [1] - 6:17
**after-dinner** [1] - 49:1
**afternoon** [14] - 1:25, 2:7, 2:10, 2:11, 2:12, 2:14, 2:15, 2:20, 2:22, 31:4, 32:19, 37:3, 41:9, 42:21
**afterwards** [1] - 33:4
**agent** [2] - 17:10, 20:7
**Agents** [1] - 2:9
**agents** [9] - 16:8, 16:13, 17:4, 18:22, 19:5, 19:20, 29:15, 44:23, 46:15
**ago** [1] - 31:6

**agree** [7] - 7:24, 14:18, 15:7, 24:11, 25:14, 28:17, 56:4
**agreed** [2] - 26:19, 28:21
**agreement** [4] - 24:8, 26:12, 30:15, 53:14, 55:2, 55:12
**agrees** [3] - 8:11, 9:18, 25:14
**ahead** [5] - 19:9, 30:13, 31:3, 42:20, 50:17
**Air** [1] - 30:24
**Alabama** [2] - 54:7, 54:8
**alcohol** [2] - 54:3, 54:15
**Alicia** [1] - 2:7
**ALICIA** [1] - 1:14
**allow** [1] - 53:16
**allowed** [2] - 54:16, 56:7
**almost** [1] - 49:15
**alters** [1] - 52:13
**Alzheimer's** [2] - 33:4, 43:25
**AMERICA** [1] - 1:4
**America** [1] - 2:2
**amount** [1] - 52:6
**angel** [1] - 45:3
**angels** [1] - 45:5
**answer** [1] - 30:8
**anticipate** [2] - 12:5, 28:23
**anxious** [1] - 20:18
**apart** [1] - 44:4
**apologize** [2] - 28:1, 50:25
**appeal** [24] - 54:19, 54:20, 54:22, 55:7, 55:9, 55:15, 55:18, 55:19, 55:21, 55:22, 55:24, 55:25, 56:1, 56:7, 56:9, 56:14, 56:16, 56:18, 56:22, 56:23, 56:24
**appealed** [1] - 56:6
**appeals** [3] - 55:15, 55:17, 56:22
**appear** [1] - 7:21
**appearance** [2] - 24:22, 24:23
**APPEARANCES** [1] - 1:13
**appearances** [1] - 2:6
**appeared** [3] - 15:10, 20:17, 20:18
**appellate** [2] - 55:2,

2

56:22
**applaud** [2] - 46:12, 46:13
**applauded** [1] - 46:12
**applicable** [1] - 26:18
**application** [1] - 21:8
**apply** [2] - 53:3, 54:22
**appoint** [1] - 55:8
**appreciate** [2] - 23:4, 49:8
**appreciation** [2] - 12:15, 14:20
**appropriate** [3] - 27:5, 29:23, 35:11
**approves** [1] - 8:5
**argue** [1] - 43:1
**arguing** [1] - 16:6
**argument** [3] - 8:25, 10:23, 35:1
**arguments** [1] - 47:12
**arrest** [1] - 14:19
**arrested** [4] - 14:16, 21:17, 21:18, 42:12
**aside** [1] - 12:3
**assertions** [1] - 9:16
**assessment** [5] - 3:20, 4:5, 7:19, 53:5, 53:11
**assessments** [3] - 5:22, 6:15, 32:23
**assigned** [2] - 38:24, 53:17
**assignment** [1] - 15:11
**assist** [1] - 39:21
**assistance** [1] - 40:20
**assistant** [1] - 47:10
**ASSISTANT** [1] - 1:15
**assisted** [1] - 28:6
**association** [1] - 21:10
**attempted** [1] - 9:14
**attempting** [1] - 9:6
**attend** [1] - 33:10
**attendance** [1] - 40:1
**attended** [1] - 21:24
**attending** [1] - 31:6
**attends** [1] - 39:15
**attention** [1] - 42:14
**attorney** [1] - 4:22
**ATTORNEY** [1] - 1:15
**Attorney** [1] - 47:11
**audience** [1] - 28:3

**authored** [1] - 29:16
**authorities** [2] - 28:7, 28:8
**Avenue** [3] - 1:23, 52:15, 57:13
**average** [1] - 48:15
**avoid** [1] - 28:9
**avoiding** [1] - 28:12
**aware** [6] - 5:21, 6:12, 6:22, 16:10, 20:12, 22:12

### B

**baby** [2] - 38:10, 38:19
**backed** [1] - 35:23
**background** [2] - 3:11, 32:21
**bad** [6] - 23:1, 36:17, 44:3, 46:19, 49:11, 51:19
**bank** [1] - 24:10
**barely** [1] - 38:21
**BARZEE** [23] - 1:17, 2:12, 2:18, 3:1, 3:9, 4:18, 25:22, 29:8, 29:24, 30:3, 30:8, 30:22, 31:3, 41:8, 42:18, 53:24, 54:2, 54:11, 54:13, 55:6, 55:16, 55:20, 56:18
**Barzee** [5] - 2:12, 25:20, 29:5, 29:22, 50:25
**based** [5] - 10:21, 22:22, 28:11, 53:6, 54:12
**basis** [1] - 6:4
**bearing** [1] - 12:24
**became** [1] - 33:6
**become** [2] - 39:8, 39:10
**becoming** [1] - 40:2
**BEFORE** [1] - 1:10
**beg** [1] - 36:15
**began** [2] - 34:18, 34:19
**begins** [1] - 8:23
**behalf** [6] - 2:8, 2:12, 2:19, 2:21, 41:11, 42:11
**bench** [1] - 24:3
**benefit** [3] - 19:13, 22:4, 22:8
**best** [5] - 15:18, 15:22, 38:5, 45:1, 47:18
**better** [2] - 46:10,

47:10
**between** [3] - 14:9, 32:17, 46:17
**Beverly** [1] - 36:25
**beyond** [1] - 55:13
**big** [2] - 10:3, 21:1
**bill** [1] - 6:23
**billed** [3] - 5:19, 6:21, 13:12
**billing** [2] - 5:15, 7:2
**biopsychosocial** [3] - 4:6, 4:8, 6:14
**bios** [1] - 4:16
**Biscayne** [10] - 5:13, 5:19, 5:25, 12:22, 13:11, 13:13, 19:21, 21:24, 22:13
**bit** [2] - 23:14, 37:11
**blackboard** [1] - 31:14
**blame** [1] - 12:8
**blaming** [1] - 11:21
**blatantly** [1] - 16:24
**bless** [1] - 36:22
**blind** [1] - 22:19
**blood** [1] - 34:13
**bond** [2] - 16:7, 41:24
**bookkeeping** [1] - 55:6
**bottom** [2] - 13:14, 50:22
**Boxtein** [1] - 41:7
**BOXTEIN** [1] - 41:9
**boys** [1] - 38:7
**break** [1] - 50:5
**briefed** [1] - 23:16
**briefly** [1] - 4:19
**bring** [2] - 16:4, 22:18
**broke** [1] - 33:10
**brought** [6] - 6:3, 6:9, 7:14, 13:23, 22:13, 22:14
**bucks** [1] - 48:15
**buddy** [1] - 34:2
**burdens** [1] - 37:15
**Bureau** [1] - 53:19
**buried** [1] - 34:5
**business** [1] - 53:2
**BY** [1] - 1:22

### C

**calculations** [1] - 3:8
**Camelot** [2] - 37:6, 38:3
**car** [1] - 33:10
**card** [1] - 33:11

**care** [2] - 35:20, 45:22
**Care** [2] - 37:6, 38:3
**cared** [1] - 31:12
**career** [2] - 23:9, 50:21
**caring** [3] - 31:21, 32:3, 38:23
**Carolina** [1] - 33:10
**Carrington** [2] - 32:16, 32:17
**CARRINGTON** [3] - 32:19, 35:3, 35:15
**carry** [1] - 10:14
**Casablanca** [1] - 20:3
**CASE** [1] - 1:2
**case** [21] - 2:2, 4:11, 5:13, 5:20, 6:4, 9:6, 11:11, 11:22, 12:23, 16:9, 21:11, 22:14, 28:20, 29:13, 29:17, 33:9, 41:24, 45:21, 47:8, 51:20
**cases** [1] - 24:5
**casino** [1] - 20:3
**category** [3] - 27:3, 29:12, 51:9
**caught** [1] - 14:10
**Center** [1] - 46:4
**certain** [4] - 4:14, 9:21, 12:15, 16:1
**certainly** [3] - 26:21, 41:22, 41:23
**certifications** [1] - 32:23
**certify** [1] - 57:7
**change** [2] - 47:15, 55:3
**changed** [1] - 4:3
**character** [3] - 23:21, 25:9, 41:1
**charged** [17] - 11:21, 17:8, 17:12, 17:13, 17:20, 17:22, 17:23, 18:2, 18:7, 18:10, 18:19, 18:23, 19:8, 21:16, 21:17, 24:17, 43:8
**cheat** [1] - 23:22
**check** [1] - 29:8
**child** [1] - 38:21
**children** [1] - 38:25
**choices** [1] - 42:3
**choose** [2] - 17:7, 18:17
**chose** [3] - 17:9, 19:21, 56:12
**church** [2] - 39:6, 40:20

**Circuit** [1] - 24:15
**circumstance** [1] - 32:8
**cited** [1] - 15:13
**City** [2] - 31:6, 31:9
**claimed** [1] - 26:3
**clarifications** [1] - 3:23
**class** [1] - 31:17
**classroom** [1] - 31:10
**clear** [1] - 18:1
**clearly** [4] - 15:25, 21:4, 21:6, 25:24
**Clerk's** [1] - 52:15
**clients** [1] - 38:24
**clinically** [1] - 12:21
**Co** [1] - 52:7
**Co-Defendants** [1] - 52:7
**cocaine** [2] - 45:10, 45:11
**cold** [1] - 38:20
**colleague** [1] - 37:1
**colleagues** [2] - 49:19, 52:3
**College** [2] - 31:6, 31:9
**college** [2] - 31:20
**colloquy** [1] - 55:4
**comedian** [1] - 50:14
**coming** [3] - 33:9, 42:23, 46:9
**commission** [1] - 21:13
**Commission** [1] - 21:15
**Commission's** [1] - 12:11
**commit** [7] - 9:9, 10:1, 10:24, 19:15, 20:4, 25:5, 25:9
**committed** [4] - 16:24, 21:1, 21:16, 35:11
**committing** [3] - 14:7, 15:5, 25:1
**Community** [2] - 37:6, 38:3
**compare** [1] - 8:22
**compared** [1] - 43:7
**compassion** [3] - 32:3, 49:24
**compassionate** [3] - 38:1, 38:23, 49:25
**complete** [1] - 50:23
**completely** [1] - 11:24
**computer** [1] - 20:9
**concerned** [2] - 5:1,

42:6
**concluded** [1] - 57:4
**condition** [1] - 53:6
**conditions** [3] - 16:7, 26:5, 52:22
**conduct** [9] - 9:20, 9:23, 12:17, 16:3, 18:8, 18:9, 21:10, 21:19, 25:17
**conference** [1] - 24:3
**confuses** [1] - 41:17
**congregation** [1] - 40:5
**conscience** [1] - 45:24
**consequences** [1] - 31:15
**consider** [8] - 10:15, 21:9, 21:20, 24:12, 24:15, 54:3, 55:10
**considered** [1] - 24:12
**considering** [2] - 51:6, 51:8
**consistent** [3] - 11:14, 53:13, 54:10
**conspiracy** [7] - 9:8, 10:1, 10:9, 10:20, 15:14, 25:25, 45:16
**constantly** [1] - 34:8
**consultant** [1] - 6:18
**continue** [6] - 14:22, 21:17, 29:6, 29:13, 37:16, 46:1
**continuing** [1] - 25:17
**contrast** [1] - 12:6
**contributions** [1] - 51:19
**control** [1] - 27:8
**converse** [1] - 17:22
**convince** [1] - 43:2
**convoluted** [1] - 35:12
**cooperate** [13] - 17:7, 17:9, 17:11, 17:13, 17:19, 17:20, 17:21, 17:23, 18:3, 18:6, 18:11, 18:18, 19:23
**cooperated** [1] - 18:23
**cooperation** [1] - 12:5
**correct** [11] - 3:8, 3:9, 3:17, 4:18, 7:14, 8:1, 8:2, 11:22, 29:21, 30:3, 55:19
**cost** [1] - 54:22
**couches** [1] - 13:14

**counsel** [2] - 2:8, 53:22, 55:8
**Count** [1] - 52:4
**count** [3] - 16:25, 32:18
**counterargument** [1] - 24:9
**couple** [1] - 31:6
**course** [1] - 37:15
**court** [3] - 48:24, 53:20, 56:22
**Court** [39] - 1:22, 5:2, 5:12, 8:19, 9:5, 9:12, 9:15, 11:10, 11:18, 13:13, 13:24, 14:18, 15:10, 16:2, 21:9, 22:7, 25:23, 26:4, 26:20, 27:8, 29:11, 30:18, 30:25, 36:15, 42:19, 42:23, 43:13, 45:24, 51:10, 52:3, 52:13, 54:3, 55:3, 55:8, 55:10, 56:4, 56:11, 57:12
**COURT** [90] - 1:1, 1:25, 2:5, 2:10, 2:14, 2:19, 2:22, 3:2, 3:5, 3:10, 3:22, 4:2, 4:15, 4:20, 4:25, 5:3, 5:8, 6:6, 7:4, 7:11, 7:23, 8:9, 9:1, 9:23, 10:3, 11:8, 14:13, 14:23, 15:1, 17:10, 17:17, 17:21, 18:13, 18:16, 18:21, 19:3, 19:9, 25:20, 26:24, 27:15, 27:22, 28:2, 28:14, 28:25, 29:3, 29:7, 29:20, 29:22, 30:2, 30:5, 30:13, 30:19, 31:2, 32:13, 32:15, 35:1, 35:5, 36:24, 37:2, 39:4, 39:9, 41:6, 42:17, 42:20, 42:25, 44:8, 44:11, 44:18, 45:18, 47:12, 47:21, 47:24, 48:8, 48:21, 49:5, 49:21, 50:3, 50:9, 50:14, 51:5, 54:1, 54:9, 54:12, 54:14, 55:5, 55:12, 55:17, 55:21, 56:15, 56:20
**Court's** [8] - 4:21, 9:15, 11:3, 27:19, 27:20, 31:1, 53:22, 56:9
**courtroom** [2] - 44:19, 53:20
**Courts** [1] - 5:6

**coworkers** [2] - 38:13, 52:2
**created** [1] - 17:3
**credible** [1] - 9:17
**credit** [1] - 33:11
**crime** [6] - 14:7, 15:5, 15:6, 21:16, 35:12, 43:8
**crimes** [1] - 51:14
**criminal** [7] - 8:24, 21:10, 27:3, 44:24, 45:16, 51:8, 51:25
**criticize** [1] - 43:5
**cross** [2] - 19:6, 55:19, 56:7
**cross-appeal** [2] - 55:19, 56:7
**cross-examination** [1] - 19:6
**CRR** [2] - 1:22, 57:12
**culpability** [1] - 10:16
**culture** [1] - 6:22
**custody** [1] - 54:15
**cut** [2] - 13:25, 50:11
**CYA** [1] - 20:19

# D

**daily** [1] - 6:4
**data** [1] - 8:14
**date** [3] - 29:5, 29:7, 29:8
**DATE** [1] - 57:12
**Dawn** [1] - 30:23
**days** [7] - 34:16, 48:14, 49:19, 53:15, 54:21, 55:21, 56:24
**De** [1] - 24:15
**deal** [1] - 21:2
**dealing** [1] - 27:13
**death** [2] - 41:13, 41:16
**debriefed** [1] - 6:8
**debt** [1] - 52:25
**December** [3] - 15:11, 20:8, 20:10
**decide** [2] - 35:2, 35:11
**decision** [1] - 56:9
**decisions** [1] - 49:11
**decrease** [2] - 27:24, 28:4
**deeds** [1] - 52:2
**deeply** [2] - 14:6, 14:23
**Defendant** [29] - 5:13, 8:21, 9:4, 9:7, 13:10, 13:14, 13:25,

16:8, 16:9, 21:5, 21:22, 23:4, 24:6, 24:7, 25:10, 26:24, 27:17, 27:24, 28:4, 28:6, 30:15, 30:17, 51:13, 51:14, 52:3, 52:17, 53:16, 53:21, 56:5
**defendant** [4] - 1:8, 9:20, 22:5, 28:25
**DEFENDANT** [31] - 1:17, 2:4, 3:4, 4:1, 4:3, 8:8, 14:3, 30:4, 30:10, 32:16, 36:25, 39:5, 39:10, 41:7, 42:21, 43:10, 44:10, 44:14, 44:22, 45:19, 47:17, 47:23, 48:5, 48:12, 49:3, 49:7, 49:22, 50:6, 50:13, 50:18, 57:3
**Defendant's** [3] - 9:16, 29:22, 53:12
**defendants** [1] - 43:8
**Defendants** [3] - 5:20, 18:4, 52:7
**defense** [3] - 8:9, 18:4, 54:24
**definitely** [2] - 37:23, 45:3
**degree** [2] - 40:10, 40:25
**deliberately** [1] - 34:20
**dementia** [1] - 26:17
**demonstrates** [1] - 21:6
**denied** [2] - 9:20
**deny** [1] - 9:24
**depressed** [1] - 20:18
**deprived** [1] - 34:20
**describe** [1] - 44:23
**described** [1] - 30:24
**deserve** [1] - 48:10
**desire** [2] - 37:20, 37:23
**Detention** [1] - 46:4
**deterrence** [1] - 51:12
**diagnoses** [1] - 44:4
**diagnosis** [2] - 43:18, 43:19
**diagnostic** [4] - 3:20, 4:5, 5:22, 7:19
**Diane** [1] - 2:9
**difference** [3] - 14:8, 14:9, 46:17
**different** [3] - 30:6, 44:2, 55:8

**differently** [1] - 5:4
**difficult** [1] - 51:21
**dinner** [1] - 49:1
**directly** [1] - 23:23
**disagree** [2] - 28:15, 28:17
**disclosure** [1] - 52:24
**discretion** [1] - 4:21
**discusses** [2] - 9:7, 11:20
**disease** [1] - 33:4
**disorders** [1] - 45:8
**disputed** [1] - 8:15
**district** [1] - 52:20
**DISTRICT** [3] - 1:1, 1:1, 1:11
**disturbing** [1] - 20:25
**DIVISION** [1] - 1:2
**Docket** [1] - 9:15
**doctor** [3] - 4:17, 6:7, 13:7
**doctors** [2] - 5:25, 22:16
**documents** [4] - 13:20, 13:22, 33:15, 46:15
**dollars** [2] - 44:19, 48:9
**done** [15] - 5:7, 6:16, 9:21, 12:12, 12:16, 14:20, 28:15, 28:22, 29:15, 32:2, 32:4, 36:16, 46:3, 47:5, 49:10
**door** [1] - 5:15
**doubt** [1] - 19:13
**down** [4] - 16:19, 16:20, 33:9, 33:10
**Dr** [2] - 5:25, 6:1
**drafted** [2] - 7:24, 20:9
**dregs** [1] - 43:15
**drinking** [1] - 34:14
**droves** [1] - 6:2
**drug** [3] - 43:19, 54:3, 54:15
**drugs** [4] - 26:17, 44:3, 45:6, 45:10
**during** [3] - 21:13, 39:17, 39:25

# E

**early** [1] - 31:18
**earn** [1] - 37:11
**earnings** [2] - 52:9, 52:13

4

**earth** [2] - 22:10,
43:15
**easier** [1] - 41:19
**echo** [2] - 11:18,
23:10
**echoed** [2] - 13:12,
20:24
**economic** [1] - 25:3
**educated** [1] - 5:12
**EDWARDS** [2] -
1:22, 57:12
**Edwards** [1] - 57:11
**eight** [1] - 37:4
**either** [1] - 5:25,
13:15, 17:6, 17:11,
17:19, 17:21, 18:3,
18:17, 24:18, 26:17,
52:8
**either/or** [1] - 18:6
**elder** [1] - 39:8
**elderly** [1] - 39:21
**electricity** [1] - 38:12
**Eleventh** [1] - 24:15
**emphasize** [1] -
15:24
**employed** [1] - 5:24
**employers** [1] -
41:25
**employment** [2] -
52:25, 53:1
**encourage** [1] -
12:11
**encouragement** [1] -
38:6
**end** [5] - 17:7, 18:18,
19:1, 27:18, 27:20
**enhance** [2] - 39:22,
40:4
**enrich** [1] - 26:1
**enriched** [1] - 48:17
**enrichment** [2] - 9:9,
48:16
**enter** [3] - 28:9,
37:17, 40:8
**entered** [2] - 9:13,
26:4
**enterprise** [1] -
44:24
**entire** [1] - 51:19
**entirely** [1] - 23:2
**entitled** [3] - 15:25,
26:24, 57:9
**entrance** [1] - 15:12
**entry** [1] - 54:21
**Entry** [1] - 9:15
**enzymes** [1] - 34:13
**equivalent** [1] -
17:24
**errors** [1] - 45:19
**especially** [1] - 37:9

**ESQ** [2] - 1:14, 1:17
**Esquire** [1] - 41:7
**esteem** [1] - 43:23
**evaluate** [1] - 13:8
**evaluated** [1] - 13:6
**evaluating** [1] - 13:1
**evaluation** [2] - 4:5,
7:24
**event** [2] - 16:22,
19:19
**evidence** [4] - 3:17,
7:17, 8:13, 18:9
**exact** [1] - 11:18
**exactly** [5] - 13:13,
17:17, 24:25, 42:13,
43:14
**examination** [1] -
19:6
**example** [1] - 24:2
**examples** [3] - 33:9,
36:3, 46:15
**exhausted** [1] -
33:16
**expect** [1] - 37:11
**expense** [1] - 47:2
**experience** [2] -
11:6, 41:13
**experiences** [1] -
41:16
**expire** [1] - 55:25
**explanation** [3] -
14:15, 26:6, 35:12
**extended** [1] - 29:8,
56:7
**extra** [1] - 51:23

**F**

**face** [3] - 9:11, 15:8,
25:19
**facility** [3] - 6:3,
6:19, 45:12
**facing** [1] - 8:22
**fact** [13] - 5:9, 5:17,
5:21, 6:21, 9:8, 10:13,
10:21, 22:25, 23:16,
24:14, 29:2, 52:1,
53:22
**factors** [1] - 51:7
**facts** [1] - 7:14
**factual** [4] - 3:10,
26:4, 26:7, 26:20
**factually** [1] - 3:17
**fair** [2] - 35:2, 56:5
**false** [2] - 10:23,
13:21
**families** [1] - 43:24
**family** [9] - 23:5,
38:22, 39:11, 40:6,

40:8, 40:11, 40:13,
40:15, 40:25
**far** [7] - 4:24, 5:1,
5:17, 6:17, 26:2, 31:8,
42:6
**fashion** [1] - 51:10
**father** [2] - 39:7,
39:17
**fault** [4] - 11:15,
13:17, 15:21, 23:11
**FBI** [2] - 2:9, 46:6
**February** [1] - 28:22
**Federal** [1] - 46:4
**fees** [1] - 33:17
**fell** [1] - 6:13
**fellow** [1] - 45:4
**few** [1] - 32:24
**field** [6] - 33:23,
37:8, 37:10, 37:16,
37:17, 40:6
**fifth** [1] - 4:14
**fight** [1] - 14:5
**fighting** [1] - 45:5
**figure** [1] - 49:5
**file** [4] - 25:13, 28:14,
55:18, 55:25
**filed** [7] - 8:18, 9:5,
11:10, 11:18, 12:6,
21:22, 54:20
**fill** [2] - 11:20, 24:6
**filled** [3] - 3:19, 3:21,
24:8
**final** [1] - 26:9
**finally** [1] - 45:12
**Financial** [1] - 52:15
**financial** [6] - 24:6,
24:8, 37:15, 37:16,
52:24, 53:6
**findings** [3] - 27:19,
27:20, 28:18
**fine** [2] - 53:7, 53:8
**finish** [1] - 19:10,
35:17
**finished** [1] - 15:5
**fired** [1] - 13:15
**first** [20] - 3:5, 6:8,
6:23, 7:18, 8:6, 9:19,
11:5, 26:12, 30:21,
30:22, 31:5, 41:14,
46:6, 46:20, 46:25,
47:3, 54:2, 55:17,
55:18, 55:23
**fit** [1] - 40:3
**five** [3] - 20:14,
48:14, 50:5
**five-minute** [1] - 50:5
**fixing** [1] - 36:1
**flies** [3] - 9:11, 15:8,
25:19
**Floor** [2] - 1:23,

57:13
**FLORIDA** [1] - 1:1
**Florida** [8] - 1:4,
1:16, 1:19, 1:24, 33:1,
52:16, 54:7, 57:13
**follow** [1] - 23:16
**following** [2] - 13:19,
50:8
**Footnote** [1] - 12:19
**FOR** [3] - 1:14, 1:17,
1:20
**Force** [1] - 30:25
**forced** [1] - 20:20
**foregoing** [1] - 57:7
**foremost** [3] - 7:18,
9:19, 11:5
**forfeiture** [2] - 53:12,
53:15
**forma** [1] - 54:23
**former** [4] - 30:24,
32:5, 32:11, 37:1
**forward** [2] - 2:16,
9:20
**foster** [3] - 38:4,
38:6, 38:7
**four** [7] - 20:14,
34:11, 41:23, 45:12,
45:13, 45:14, 46:3
**Fourth** [1] - 1:15
**fourth** [1] - 4:14
**fraud** [18] - 5:1, 9:10,
10:2, 12:2, 13:11,
16:24, 17:6, 18:17,
19:15, 20:5, 21:1,
24:5, 24:10, 24:21,
25:2, 25:5, 25:9,
47:25
**fraudulent** [2] - 17:3,
18:9
**Friday** [1] - 41:14
**friend** [2] - 32:17,
36:20
**friends** [1] - 23:5,
33:6, 52:2
**front** [4] - 12:4, 17:7,
18:18, 24:4
**frustrate** [1] - 48:19
**Ft** [1] - 31:7
**full** [2] - 22:3, 22:4
**fun** [1] - 46:4
**fundamental** [1] -
14:8
**future** [1] - 31:12

**G**

**gambling** [1] - 20:2
**generally** [4] - 3:19,
12:23, 43:19, 43:22

**gesture** [1] - 38:21
**gift** [1] - 24:14
**given** [7] - 11:11,
11:25, 23:25, 25:7,
25:8, 27:19, 28:19
**glorified** [1] - 22:15
**goal** [2] - 47:14,
47:16
**goals** [1] - 51:16
**God** [2] - 20:2, 36:22
**Government** [25] -
3:12, 3:18, 8:11, 9:18,
17:5, 18:11, 19:19,
19:23, 20:21, 21:1,
21:23, 23:25, 26:5,
26:7, 27:10, 27:25,
28:6, 28:9, 29:19,
53:14, 54:24, 54:25,
55:15, 55:17, 56:21
**GOVERNMENT** [1] -
1:14
**government** [1] -
47:1
**Government's** [2] -
3:23, 27:5
**grade** [1] - 56:10
**graduate** [1] - 31:20
**graduated** [2] -
32:22, 37:15
**granddaughter** [2] -
38:11, 38:19
**great** [4] - 8:12,
10:14, 19:25, 45:10
**greater** [2] - 51:11,
51:16
**gross** [1] - 52:12
**group** [13] - 7:1,
7:20, 15:17, 17:3,
20:17, 26:11, 26:13,
26:18, 26:21, 46:8,
46:11, 46:17, 49:16
**groups** [3] - 26:10,
38:3, 46:9
**guess** [3] - 17:13,
17:22, 35:4
**guidance** [4] - 11:23,
11:25, 40:21, 40:25
**guideline** [10] - 8:22,
22:10, 21:3, 27:4,
27:13, 27:18, 51:9,
51:15, 56:12, 56:15
**guidelines** [3] - 3:7,
25:12, 55:14
**guilt** [1] - 12:7
**guilty** [9] - 11:2,
26:1, 26:3, 28:9,
28:12, 28:21, 29:1,
35:7
**guy** [1] - 36:17

5

## H

50:22

half [4] - 34:7, 35:24, 41:24, 51:21
Hamer [39] - 2:3, 2:4, 2:13, 3:2, 3:6, 4:22, 5:11, 5:20, 6:20, 10:8, 11:10, 15:25, 16:15, 19:15, 20:10, 23:5, 26:14, 30:8, 30:23, 31:5, 31:7, 31:17, 32:8, 32:21, 33:3, 37:5, 37:13, 38:5, 38:9, 38:18, 41:11, 42:18, 42:20, 49:16, 49:17, 50:10, 54:19, 55:7
HAMER [1] - 1:7
hamer [1] - 2:5
Hamer's [6] - 7:16, 29:16, 29:24, 30:24, 37:24, 51:24
hand [1] - 48:25
handful [2] - 13:20, 13:22
handle [1] - 34:24
happy [4] - 10:6, 10:7, 16:10, 29:14
hard [2] - 37:14, 49:25
hardest [1] - 48:22
Harvard [1] - 32:22
haul [1] - 37:18
healthcare [4] - 9:10, 10:2, 24:5, 53:1
hear [4] - 30:19, 39:5, 42:7, 50:12
heard [2] - 52:2, 53:18
hearing [2] - 15:10, 17:1
HEARING [1] - 1:10
heart [8] - 36:4, 36:15, 37:21, 37:24, 38:1, 47:18, 50:23, 51:4
hedge [1] - 12:8
held [1] - 21:13
hello [1] - 39:14
help [31] - 17:7, 18:3, 18:17, 19:25, 31:19, 33:7, 33:8, 33:20, 35:1, 35:10, 36:5, 36:6, 37:18, 37:20, 37:23, 38:10, 38:16, 39:2, 40:4, 40:21, 44:9, 44:11, 44:12, 44:15, 46:3, 46:5, 49:5, 49:11, 49:19,

helped [6] - 31:24, 35:24, 38:22, 44:25, 48:7, 49:16
helping [7] - 32:5, 35:9, 35:13, 35:14, 35:18, 41:18, 47:25
hereby [1] - 57:7
high [1] - 34:14
higher [2] - 44:7, 56:10
highlight [1] - 40:17
highly [1] - 22:22
himself [4] - 5:14, 22:9, 26:1, 31:21
history [2] - 27:3, 51:9
hold [4] - 19:1, 19:3, 23:18, 23:19
home [3] - 33:15, 33:18, 35:20, 35:21, 36:1, 38:11, 38:16, 38:18, 39:24, 40:23, 42:5
homes [1] - 38:12
honest [1] - 29:10
Honor [90] - 2:4, 2:7, 2:17, 2:18, 2:25, 3:1, 3:4, 3:9, 3:16, 4:1, 4:19, 5:6, 5:11, 7:13, 8:8, 8:17, 8:18, 9:3, 9:12, 9:19, 9:25, 11:13, 12:9, 12:18, 14:25, 15:7, 15:23, 17:15, 17:25, 18:25, 19:5, 19:12, 20:6, 21:3, 21:21, 23:3, 24:11, 24:14, 25:12, 25:22, 26:23, 27:7, 27:14, 27:16, 28:1, 28:24, 29:2, 29:9, 29:18, 29:21, 29:24, 30:10, 30:14, 30:22, 31:4, 32:18, 37:3, 39:6, 39:14, 41:4, 41:7, 41:8, 42:18, 42:21, 43:10, 44:5, 44:14, 45:4, 45:25, 47:17, 48:5, 48:12, 48:19, 49:3, 49:10, 49:18, 49:22, 50:6, 50:13, 50:24, 51:2, 53:24, 54:2, 54:25, 55:6, 56:4, 56:8, 56:19, 57:2, 57:3
Honor's [1] - 22:12
HONORABLE [1] - 1:10
honorably [1] - 52:1
hope [3] - 10:12,

18:25, 43:22
hour [2] - 48:15, 51:21
hours [5] - 34:11, 37:14, 37:16, 48:15, 52:19
house [3] - 33:20, 33:21, 38:14
hundreds [1] - 22:21
Hurricane [1] - 38:10
hurricane [1] - 38:16
husband [1] - 31:5
hypothetical [1] - 19:14

## I

IDA [1] - 3:19
IDAs [1] - 5:21
idea [3] - 20:2, 42:23, 56:18
identical [1] - 14:2
identifying [1] - 8:14
idiot [1] - 10:18
ill [3] - 35:20, 44:25, 45:12
illegal [2] - 22:23, 23:15
imagine [1] - 31:25
immediately [2] - 35:22, 53:5
immunity [13] - 16:12, 16:13, 16:16, 16:17, 16:19, 16:21, 17:14, 17:24, 18:24, 19:7, 19:15, 19:16, 47:4
impact [5] - 31:22, 32:9, 32:12, 39:18, 40:19
impacted [1] - 32:4, 39:25, 41:3
importance [1] - 40:2
important [2] - 12:21, 15:23
impose [1] - 53:7
imposed [1] - 53:21
impossible [2] - 4:7, 8:4
imprisonment [1] - 52:4
improving [1] - 13:2
impunity [1] - 19:16
in-home [1] - 40:23
incarcerated [1] - 52:8
incarceration [1] - 52:11

include [1] - 3:24
including [1] - 50:24
inconsistent [1] - 16:11
incorrect [1] - 26:15
incredible [1] - 34:14
incredibly [1] - 45:6
incriminating [1] - 22:11
indicated [1] - 39:14
indicates [2] - 25:24, 26:20
indictment [2] - 11:1, 16:25
individual [1] - 46:18
influenced [1] - 31:11
influencing [1] - 32:5
influential [1] - 31:9
inform [1] - 26:14
information [2] - 3:23, 46:7
initial [4] - 4:4, 4:5, 6:14, 7:24
initials [1] - 4:4
innocence [2] - 9:16, 35:6
innocent [1] - 19:22, 23:11
instance [1] - 25:15
instances [1] - 20:6
instead [2] - 4:22, 19:21
institution [2] - 53:17, 53:18
institutions [1] - 54:9
instructed [1] - 26:6
insult [1] - 46:8
integrated [3] - 3:20, 5:21, 7:19
intend [2] - 55:7, 56:13
intensive [1] - 40:22
intent [1] - 15:14
intention [2] - 28:8, 29:25
intentions [1] - 49:11
interest [1] - 53:13
interested [1] - 13:24
interestingly [1] - 20:11
interject [1] - 30:14
introduce [1] - 32:20
investigation [6] - 2:24, 17:6, 18:16, 25:18, 28:7, 53:3
involve [1] - 37:14
involved [2] - 10:1,

10:19
involvement [1] - 15:20
IP [1] - 6:15
IPE [4] - 3:18, 4:9, 4:10, 6:17
IPEs [3] - 6:18, 7:17, 45:14
irrelevant [1] - 11:24
issue [5] - 3:12, 8:15, 8:19, 22:25, 30:18
issues [1] - 13:3, 13:4
items [1] - 29:16

## J

Jackson [7] - 11:21, 12:3, 12:6, 21:23, 22:2, 22:9, 23:2
jail [3] - 41:24, 42:5, 42:11
Jake [1] - 2:9
JESSICA [1] - 1:20
Jessica [1] - 2:20
job [6] - 31:18, 34:15, 38:2, 46:21, 49:2, 52:10
jobs [3] - 25:5, 46:16, 49:18
John [1] - 11:21
jointly [1] - 52:6
journey [1] - 31:16
JR [1] - 1:10
judge [1] - 48:24
Judge [7] - 10:25, 12:4, 16:6, 16:23, 20:24, 24:2, 41:9
JUDGE [1] - 1:11
judgment [2] - 52:3, 54:21
judicial [1] - 24:3
July [2] - 53:17, 53:20
jumped [1] - 23:8
jurisdictional [1] - 56:23

## K

keep [2] - 34:21, 51:23
kickback [1] - 22:23
kids [1] - 38:5
kind [7] - 14:14, 17:24, 19:24, 32:12, 38:1, 48:4
Kirk [1] - 30:23

**KIRK** [2] - 31:4, 32:14
**knowing** [3] - 22:11, 46:11, 48:1
**known** [5] - 37:5, 38:23, 39:16, 40:18, 41:12
**knows** [2] - 5:11, 8:18
**Kushner** [1] - 6:1

## L

**lack** [1] - 12:12
**LaFaveur** [2] - 39:7, 39:15
**LAFAVEUR** [1] - 39:13
**larger** [1] - 19:11
**last** [6] - 17:2, 33:25, 34:2, 34:7, 41:8, 51:21
**Lauderdale** [1] - 31:7
**law** [2] - 25:25, 36:8
**lawyer** [5] - 17:11, 17:23, 42:25, 47:1, 47:6
**lawyers** [1] - 33:17
**lead** [1] - 18:22
**leader/organizer** [1] - 24:18
**leaking** [1] - 36:1
**learn** [1] - 37:21
**learned** [2] - 20:23, 34:18
**least** [5] - 10:7, 13:22, 20:1, 43:13, 44:6
**leave** [1] - 54:22
**leaving** [1] - 31:18
**lecture** [1] - 33:3
**legal** [4] - 10:23, 28:16, 28:17, 33:17
**legitimacy** [2] - 24:22, 24:23
**legitimate** [1] - 6:17
**length** [1] - 54:12
**lenient** [1] - 42:14
**less** [5] - 35:8, 43:3, 43:7, 43:9, 43:11
**lesson** [1] - 20:23
**letter** [11] - 9:5, 9:7, 10:21, 11:5, 11:6, 25:23, 29:2, 29:4, 29:9, 30:6, 50:24
**letters** [11] - 11:18, 23:3, 23:7, 23:8, 23:20, 25:2, 25:16, 30:7, 30:11, 30:12,

43:5
**letting** [2] - 20:20, 42:10
**level** [6] - 10:16, 27:2, 28:5, 51:8, 54:10
**levels** [2] - 27:1, 29:1
**liable** [1] - 52:7
**liars** [1] - 50:1
**license** [1] - 40:12
**licensed** [2] - 32:25, 39:10
**licensing** [1] - 33:1
**lie** [1] - 23:22
**lied** [1] - 5:10
**lies** [1] - 5:8
**life** [16] - 31:15, 31:22, 32:3, 32:12, 33:7, 34:15, 37:10, 38:2, 38:9, 39:25, 40:19, 41:3, 41:13, 42:4, 43:2, 51:24
**lifetime** [1] - 51:19
**Lindsey** [1] - 2:9
**LISA** [2] - 1:22, 57:12
**listen** [2] - 15:16, 16:16
**listened** [1] - 38:7
**listening** [1] - 51:2
**lived** [1] - 35:20
**liver** [1] - 34:13
**lives** [6] - 32:9, 39:19, 40:4, 40:19, 43:24, 54:6
**living** [1] - 38:11
**location** [1] - 54:5
**look** [6] - 10:3, 10:25, 20:20, 34:5, 40:6, 51:19
**looked** [1] - 38:8
**looking** [6] - 20:13, 27:22, 34:12, 39:1, 51:24
**looks** [1] - 13:1
**lose** [1] - 25:5, 42:5, 56:23
**losing** [1] - 42:4
**lost** [2] - 32:18, 33:11
**love** [2] - 23:6, 25:6
**low** [5] - 27:18, 27:20, 47:13, 47:14, 50:3
**ludicrous** [2] - 23:19, 23:20
**lying** [1] - 25:1

## M

**machine** [1] - 35:23
**Magistrate** [3] - 16:6, 16:23, 20:24
**main** [1] - 5:25
**major** [1] - 44:6
**majority** [1] - 22:23
**man** [9] - 23:12, 34:5, 36:19, 36:20, 41:2, 41:20, 42:8, 46:5, 49:23
**managers** [3] - 6:4, 22:14, 45:22
**manner** [1] - 53:23
**MANZANARES** [1] - 1:20
**Manzanares** [1] - 2:21
**mark** [1] - 41:7
**marriage** [7] - 39:11, 40:6, 40:8, 40:10, 40:13, 40:15, 40:25
**master** [3] - 12:20, 12:23, 12:25
**master's** [1] - 40:10
**material** [1] - 31:14
**matter** [2] - 32:7, 57:9
**maximum** [1] - 55:13
**McGinty** [4] - 2:9, 46:20, 47:3, 47:9
**mean** [6] - 6:17, 10:18, 28:2, 35:15
**measure** [1] - 20:19
**medical** [1] - 32:25
**Medicare** [6] - 13:1, 23:24, 24:1, 44:12, 47:25, 48:10
**medicine** [1] - 33:23
**meet** [1] - 47:10
**meeting** [4] - 20:25, 41:14, 44:23, 46:21
**meetings** [1] - 41:16
**members** [4] - 39:19, 39:23, 40:5, 40:20
**memo** [1] - 25:16
**memorandum** [13] - 5:14, 6:20, 8:18, 8:21, 9:4, 11:9, 11:13, 11:19, 12:19, 15:8, 16:18, 17:1, 21:22
**mentioned** [1] - 3:18
**mentions** [1] - 8:21
**mentor** [1] - 31:19
**mentoring** [1] - 32:6
**mercy** [2] - 36:17, 36:19
**met** [14] - 16:8, 16:9,

16:23, 17:4, 19:19, 19:20, 20:7, 31:5, 33:3, 37:5, 47:3
**methods** [1] - 31:13
**MIAMI** [1] - 1:2
**Miami** [9] - 1:4, 1:16, 1:19, 1:23, 1:24, 52:15, 52:16, 57:13, 57:13
**midst** [1] - 38:15
**might** [2] - 46:12, 51:3
**Milieu** [3] - 5:13, 5:19, 21:24
**military** [3] - 23:12, 23:14, 52:1
**millions** [1] - 44:19, 48:9
**mind** [1] - 8:24
**mine** [2] - 32:17, 33:24
**minimize** [1] - 12:8
**minimizing** [1] - 15:19
**minimum** [2] - 20:1, 42:9
**ministry** [4] - 39:17, 39:20, 40:1, 40:3
**minor** [2] - 24:13, 24:16
**mints** [1] - 49:1
**minute** [1] - 50:5
**misconduct** [1] - 28:8
**misspoke** [2] - 19:1, 19:4
**mistake** [1] - 23:11
**mistakes** [5] - 32:2, 45:20, 47:20, 49:10, 50:19
**misunderstood** [2] - 17:15, 17:17
**mom** [1] - 35:10
**moment** [3] - 5:10, 8:12, 30:14
**Monday** [2] - 46:24, 46:25
**money** [6] - 11:1, 24:19, 33:18, 33:19, 37:9
**Montgomery** [2] - 54:7, 54:18
**month** [1] - 41:14
**monthly** [1] - 52:12
**months** [17] - 8:23, 12:4, 27:4, 27:14, 27:21, 29:20, 35:9, 41:24, 43:3, 43:6, 43:7, 46:4, 51:10, 53:9, 56:15, 56:16

**months'** [1] - 52:4
**moral** [2] - 23:21, 25:9
**moreover** [2] - 5:24, 6:11
**mortgaged** [2] - 33:20, 33:21
**most** [12] - 6:9, 7:3, 12:20, 13:8, 16:22, 19:22, 20:25, 24:19, 26:12, 26:21, 31:8, 43:21
**mostly** [1] - 6:13
**mother** [3] - 33:13, 33:17, 33:20
**motion** [10] - 27:10, 27:25, 28:5, 28:11, 28:14, 28:15, 29:11, 29:18, 30:16, 30:20
**motivation** [1] - 37:18
**mouth** [1] - 51:23
**movie** [1] - 34:2
**movies** [2] - 34:1, 34:3
**MR** [28] - 2:12, 2:18, 3:1, 3:9, 4:18, 25:22, 29:8, 29:24, 30:3, 30:8, 30:22, 31:3, 32:19, 35:3, 35:15, 37:3, 39:13, 41:8, 41:9, 42:18, 53:24, 54:2, 54:11, 54:13, 55:6, 55:16, 55:20, 56:18
**MS** [45] - 2:7, 2:11, 2:17, 2:25, 3:16, 4:19, 4:21, 5:1, 5:6, 5:11, 6:8, 7:9, 7:13, 8:1, 8:17, 9:3, 9:25, 11:3, 11:9, 14:4, 14:18, 14:25, 15:7, 17:15, 17:19, 17:25, 18:15, 18:20, 18:25, 19:5, 19:11, 27:7, 27:16, 27:25, 28:13, 28:17, 29:2, 29:4, 29:21, 30:14, 31:4, 32:14, 54:25, 56:3, 57:2
**multitude** [1] - 8:24
**must** [3] - 11:2, 51:10, 54:20

## N

**N.S** [1] - 17:2
**naive** [3] - 35:16, 36:4, 36:18
**name** [2] - 17:2,

39:14
  **near** [3] - 41:13, 41:16, 54:16
  **near-death** [2] - 41:13, 41:16
  **nearly** [2] - 4:6, 23:25
  **necessarily** [1] - 19:22
  **necessary** [3] - 51:11, 51:16, 51:20
  **need** [11] - 6:21, 7:8, 19:22, 24:22, 24:24, 27:8, 29:17, 42:25, 43:1, 43:4, 43:5
  **needed** [8] - 13:5, 25:3, 33:8, 34:23, 36:6, 39:23, 40:4, 46:5
  **needs** [1] - 46:2
  **never** [4] - 4:10, 6:19, 7:24, 9:19, 10:25, 15:14, 16:15, 16:16, 17:16, 19:7, 19:17, 22:6, 23:21, 23:22, 26:3, 33:7, 36:2, 36:6, 42:11, 48:13, 56:3
  **nevertheless** [1] - 48:17
  **New** [1] - 33:9
  **new** [5] - 27:13, 33:12, 38:25, 45:20, 52:25
  **next** [3] - 2:2, 8:15, 43:6
  **night** [3] - 34:1, 34:11, 46:24
  **nine** [1] - 5:17
  **NO** [1] - 1:2
  **no-new-debt** [1] - 52:25
  **nobody** [1] - 11:24, 35:20, 37:8
  **nobody's** [1] - 30:20
  **none** [1] - 8:11
  **nonetheless** [1] - 7:17
  **North** [3] - 1:23, 52:15, 57:13
  **Northeast** [1] - 1:15
  **Northwest** [1] - 1:18
  **note** [6] - 12:1, 13:25, 17:3, 20:13, 20:21, 26:9
  **noted** [5] - 5:14, 9:16, 53:2
  **notes** [14] - 7:6, 7:21, 20:8, 20:12, 21:8, 23:17, 24:24, 29:16,

34:5, 34:6, 34:8, 34:16, 34:20
  **nothing** [4] - 5:8, 15:17, 36:9, 47:13
  **notice** [2] - 54:20, 55:25
  **noticed** [1] - 49:7
  **notifying** [2] - 28:8, 28:12
  **Nova** [1] - 40:9
  **November** [1] - 20:7
  **number** [7] - 11:24, 22:11, 22:12, 26:9, 33:5, 33:11, 34:1
  **numerous** [1] - 35:18
  **nut** [1] - 22:20
  **nutritionist** [1] - 32:25

**O**

  **oath** [4] - 4:23, 5:5, 5:10
  **object** [3] - 27:18, 53:22, 56:10
  **objection** [5] - 3:12, 3:25, 8:10, 15:13, 25:13
  **objections** [7] - 3:5, 3:6, 3:7, 3:24, 8:12, 8:13, 53:24
  **objects** [1] - 54:25
  **obligation** [1] - 7:14
  **obvious** [1] - 12:1
  **obviously** [8] - 9:18, 10:4, 21:15, 25:13, 27:18, 41:25, 42:3, 56:12
  **occasion** [1] - 39:23
  **occasions** [2] - 35:18, 38:22
  **occupations** [1] - 37:12
  **occur** [1] - 24:21
  **OF** [2] - 1:1, 1:4
  **offense** [5] - 21:7, 21:13, 27:2, 51:8, 51:12
  **offer** [1] - 19:25
  **offered** [5] - 16:12, 16:15, 16:18, 19:7, 19:15
  **offering** [1] - 16:13
  **Office** [1] - 52:15
  **office** [3] - 21:12, 52:20, 56:13
  **OFFICER** [1] - 2:20
  **Official** [1] - 57:12

**official** [1] - 1:22
  **often** [2] - 23:10, 48:25
  **oftentimes** [2] - 7:3, 7:21
  **old** [1] - 33:13
  **once** [5] - 16:2, 22:20, 33:9, 37:15, 42:10
  **one** [33] - 4:12, 6:1, 7:11, 7:13, 8:20, 11:24, 13:7, 13:25, 14:1, 15:7, 22:2, 22:8, 22:11, 22:17, 22:20, 24:18, 25:2, 30:14, 31:8, 35:17, 36:11, 36:18, 37:7, 37:18, 41:8, 43:17, 45:9, 46:11, 47:7, 49:19, 55:6
  **open** [1] - 53:19
  **opened** [2] - 38:16, 38:18
  **opinion** [1] - 31:8
  **opportunities** [2] - 25:8
  **opportunity** [6] - 2:23, 41:5, 41:10, 42:22, 43:14, 50:22
  **opposite** [1] - 21:11
  **options** [2] - 17:8, 18:5
  **order** [7] - 9:13, 9:15, 24:22, 52:5, 53:4, 53:12, 53:15
  **ordered** [4] - 11:16, 13:17, 23:12, 23:17
  **orders** [1] - 23:15
  **otherwise** [1] - 26:3
  **outlines** [1] - 11:10
  **outside** [1] - 40:5
  **overall** [1] - 6:11
  **overarching** [1] - 6:25
  **overloaded** [1] - 34:20
  **overlooked** [1] - 50:20
  **overlooking** [1] - 50:19
  **own** [6] - 9:12, 16:12, 16:19, 22:7, 34:17, 38:16, 41:21

**P**

  **p.m** [3] - 1:6, 56:6
  **page** [3] - 12:19, 13:19, 15:16

**Page** [6] - 11:19, 12:19, 13:10, 13:19, 14:4, 21:21
  **Pages** [1] - 1:8
  **paid** [11] - 22:17, 36:2, 44:12, 44:20, 46:8, 46:10, 46:13, 48:9, 48:14
  **panel** [1] - 38:13
  **paperwork** [1] - 11:20
  **paragraph** [2] - 7:12, 7:13
  **Paragraph** [3] - 3:13, 8:10, 30:17
  **Paragraphs** [1] - 8:14
  **parents** [2] - 38:6, 38:7
  **parking** [1] - 36:8
  **part** [5] - 4:2, 9:8, 15:14, 41:17, 47:24
  **Part** [2] - 28:16, 53:22
  **participate** [1] - 7:7
  **participated** [1] - 6:12
  **participates** [1] - 54:15
  **participating** [1] - 6:7
  **participation** [1] - 28:3
  **particularly** [3] - 23:20, 23:25, 45:6
  **parties** [1] - 51:6
  **past** [1] - 5:7
  **pasted** [1] - 13:25
  **pastor** [2] - 39:7, 39:18
  **patient** [27] - 4:7, 4:10, 4:12, 4:13, 4:16, 5:15, 5:16, 8:5, 12:1, 13:2, 13:5, 13:7, 13:9, 14:1, 15:21, 17:2, 17:3, 20:14, 20:15, 20:17, 20:22, 22:16, 33:24, 46:17, 46:18
  **patient's** [1] - 13:3
  **patients** [34] - 5:16, 5:22, 6:2, 6:3, 6:9, 6:19, 7:1, 7:6, 7:17, 7:21, 14:2, 20:14, 21:24, 22:10, 22:12, 22:18, 22:20, 22:23, 23:1, 23:17, 24:24, 26:12, 26:16, 43:25, 45:9, 45:22, 46:7, 47:19, 48:6, 48:11, 48:18, 49:12, 49:14, 49:24

**pauperis** [1] - 54:23
  **pause** [1] - 28:2
  **pausing** [2] - 28:1, 28:2
  **pay** [8] - 44:21, 52:5, 52:8, 52:11, 53:4, 53:7, 54:21, 56:10
  **payable** [1] - 52:14
  **payment** [1] - 52:13
  **payments** [1] - 22:23
  **Pensacola** [2] - 54:7, 54:18
  **Penthouse** [1] - 1:18
  **people** [37] - 6:13, 7:7, 10:5, 10:6, 11:1, 12:8, 12:12, 15:4, 19:22, 25:6, 26:10, 26:21, 30:5, 30:11, 30:19, 36:6, 36:17, 37:19, 37:23, 38:14, 39:5, 40:21, 41:16, 41:18, 42:2, 43:16, 43:20, 43:21, 44:9, 44:12, 44:13, 44:15, 44:20, 44:25, 46:9, 47:25, 48:9
  **people's** [1] - 32:9
  **per** [1] - 52:9
  **percent** [9] - 21:24, 22:9, 22:13, 22:14, 23:1, 26:22, 43:14, 52:9, 52:12
  **perfect** [1] - 45:2
  **period** [2] - 18:3, 55:24
  **permissible** [1] - 53:1
  **permission** [1] - 31:1
  **permit** [1] - 45:21
  **permitted** [1] - 7:2
  **permitting** [2] - 6:15, 28:9
  **person** [8] - 17:12, 19:24, 30:21, 30:22, 36:4, 36:10, 40:18, 52:19
  **personal** [2] - 38:2, 38:9
  **personally** [2] - 24:4, 26:1
  **Ph.D** [1] - 40:15
  **phone** [2] - 33:12, 47:9
  **PHP** [3] - 12:23, 13:8, 13:9
  **physically** [1] - 45:11
  **picture** [1] - 10:3
  **place** [4] - 21:18, 39:15, 44:24, 48:8
  **placed** [2] - 4:23,

8

52:18
**plain** [1] - 11:25
**Plaintiff** [1] - 1:5
**plan** [3] - 12:20, 12:24, 12:25
**plea** [20] - 9:6, 9:14, 10:5, 10:6, 10:7, 15:12, 24:7, 25:23, 25:24, 26:12, 28:9, 28:23, 29:11, 30:15, 53:14, 55:2, 55:3, 55:12
**plead** [4] - 28:21, 29:5, 29:7
**pleading** [1] - 28:12
**pleads** [1] - 28:25
**plenty** [1] - 25:6
**podium** [1] - 31:3
**point** [12] - 11:3, 19:11, 22:2, 25:22, 27:11, 28:19, 35:17, 37:7, 37:25, 46:11, 55:6, 56:8
**pointed** [5] - 7:20, 9:4, 9:12, 10:25, 25:2
**points** [1] - 27:8
**position** [3] - 21:13, 27:5, 29:23
**positive** [4] - 32:9, 39:18, 40:19, 41:3
**possible** [1] - 54:17
**possibly** [4] - 22:14, 34:21, 42:9, 42:15
**practice** [1] - 5:13
**predisposed** [1] - 34:22
**preparation** [1] - 28:12
**prepare** [4] - 4:15, 4:16, 10:23, 31:19
**prepared** [3] - 2:16, 3:6, 7:6
**preparing** [1] - 28:10
**present** [5] - 2:13, 20:15, 20:16, 39:21
**presentation** [1] - 3:25
**presentence** [3] - 2:24, 51:7, 53:2
**pressure** [1] - 34:15
**pretty** [2] - 25:23, 49:25
**previously** [1] - 27:12
**primary** [1] - 41:25
**prison** [7] - 43:6, 48:23, 48:25, 51:23, 52:17, 53:9, 54:10
**Prisons** [1] - 53:19
**private** [1] - 37:13

**privilege** [2] - 36:22, 44:15
**privileged** [1] - 41:11
**Probation** [5] - 2:19, 2:21, 9:18, 25:13, 25:14
**PROBATION** [2] - 1:20, 2:20
**probation** [2] - 29:25, 52:20
**problem** [3] - 23:6, 43:19, 44:3
**problems** [3] - 13:3, 43:17, 44:6
**proceeding** [1] - 53:15
**Proceedings** [1] - 57:4
**proceedings** [2] - 50:8, 57:8
**process** [1] - 42:4
**Professor** [2] - 31:5, 32:16
**professor** [2] - 31:7, 32:16
**professors** [1] - 31:9
**proffer** [3] - 26:4, 26:8, 26:20
**profit** [1] - 10:9
**profiting** [1] - 10:19
**profound** [2] - 31:22, 32:9
**program** [3] - 24:1, 40:9, 54:4
**progress** [1] - 13:5
**prohibits** [1] - 30:16
**pronounced** [1] - 53:23
**proper** [1] - 43:18
**properly** [1] - 45:15
**property** [1] - 53:13
**proposed** [1] - 53:14
**prosecution** [1] - 28:7
**prosecutor** [2] - 23:9, 42:13
**protect** [1] - 51:13
**proud** [3] - 36:20, 49:13
**prove** [3] - 29:13, 29:17, 35:6
**provided** [1] - 46:15
**provision** [1] - 27:4
**PSI** [1] - 3:16
**psych** [1] - 44:6
**psychiatric** [5] - 4:5, 7:24, 44:4, 45:7, 45:10
**psychiatrist** [12] - 4:8, 4:11, 4:12, 4:17,

5:16, 5:18, 5:23, 6:10, 6:16, 7:3, 8:5, 43:18
**psychiatrists** [3] - 5:24, 7:18, 22:17
**psychological** [2] - 32:23, 43:17
**psychology** [1] - 31:7
**psychometry** [1] - 32:23
**public** [1] - 51:13
**punished** [1] - 42:8
**punishment** [3] - 12:14, 42:6, 51:12
**purpose** [3] - 12:10, 22:17
**purposes** [1] - 55:8
**pursue** [1] - 40:15
**pursuing** [1] - 40:25
**pushed** [1] - 11:15
**put** [5] - 4:4, 7:1, 22:15, 29:11, 33:15
**puts** [1] - 20:14

## Q

**qualifies** [2] - 27:24, 28:4
**qualify** [5] - 7:6, 21:25, 22:10, 22:22, 22:24
**quarter** [1] - 52:10
**questioned** [1] - 33:4
**questions** [3] - 6:23, 33:5, 42:12
**quit** [1] - 46:21
**quite** [3] - 4:14, 27:17, 44:2
**quitting** [1] - 19:21
**quotations** [1] - 14:2
**quote** [1] - 6:3
**quote-unquote** [1] - 6:3
**quotes** [1] - 22:15

## R

**rainy** [1] - 46:24
**raise** [1] - 30:18
**raised** [2] - 23:21
**ran** [2] - 33:18, 38:3
**range** [8] - 8:22, 27:4, 27:13, 27:18, 51:9, 51:16, 56:12, 56:15
**ranges** [1] - 8:23
**rare** [1] - 46:14
**rarely** [1] - 5:16

**rascals** [1] - 50:1
**rate** [1] - 52:12
**rather** [2] - 12:5, 14:4
**rationalized** [1] - 14:15
**reach** [1] - 38:25
**read** [3] - 3:6, 11:13, 23:7
**real** [1] - 40:18
**reality** [1] - 41:17
**really** [16] - 7:23, 11:16, 12:24, 23:10, 28:11, 33:5, 35:13, 37:18, 40:18, 45:25, 46:1, 47:14, 49:13, 51:18, 51:20, 51:22
**realtime** [1] - 18:13
**reason** [4] - 4:25, 25:24, 28:19, 53:18
**reasons** [1] - 27:11
**receive** [5] - 2:23, 9:9, 22:3, 40:10, 40:12
**received** [2] - 9:21, 40:24
**recently** [5] - 11:10, 20:9, 35:19, 39:8, 39:10
**recess** [1] - 50:7
**recidivism** [1] - 12:13
**recommend** [2] - 54:14, 54:18
**recommendation** [3] - 27:15, 29:20, 54:7
**recommending** [2] - 27:20, 54:3
**record** [2] - 7:15, 8:2
**records** [1] - 13:23
**recruited** [1] - 22:13
**recruiters** [1] - 22:16
**recruiting** [2] - 22:21, 45:23
**reduce** [1] - 45:5
**reduction** [1] - 26:25
**reference** [1] - 41:2
**referenced** [1] - 17:1
**references** [1] - 13:19
**reflect** [1] - 51:11
**refute** [1] - 8:13
**regard** [2] - 9:3, 16:5
**relate** [1] - 32:21
**related** [1] - 23:23
**relationships** [1] - 39:22
**release** [2] - 52:11, 52:17, 52:18, 52:19, 52:21, 52:22, 53:10
**released** [1] - 52:20

**relevant** [3] - 9:20, 9:23, 36:14
**remain** [1] - 50:15
**remorseful** [2] - 49:9, 50:20
**repairs** [1] - 35:22
**repeat** [2] - 12:17, 16:3
**repeating** [4] - 26:7, 27:6, 27:7, 27:16
**report** [2] - 2:24, 52:19, 53:3
**REPORTED** [1] - 1:22
**Reporter** [2] - 1:22, 57:12
**reports** [2] - 10:24, 51:7
**representing** [1] - 39:6
**request** [4] - 29:25, 54:2, 54:5, 55:8
**requests** [1] - 53:25
**required** [1] - 24:7
**requirement** [2] - 52:24, 52:25
**resignation** [1] - 21:12
**resolve** [1] - 13:4
**resources** [1] - 40:24
**respect** [2] - 8:17, 27:19
**respectful** [1] - 36:7
**respond** [1] - 4:19
**responding** [1] - 4:22
**response** [2] - 3:24, 25:20
**responsibility** [10] - 12:7, 14:14, 15:4, 21:4, 21:6, 22:3, 22:4, 26:25, 27:23, 50:23
**responsible** [2] - 23:18, 45:22
**rest** [1] - 18:4
**restitution** [4] - 52:5, 52:12, 52:14, 53:10
**restriction** [2] - 52:25, 53:1
**restrictions** [1] - 53:2
**result** [1] - 40:24
**retired** [1] - 33:2
**reunited** [1] - 43:24
**review** [1] - 2:23
**reviewed** [3] - 3:2, 13:6, 23:3
**ride** [1] - 39:24
**ridiculous** [1] - 16:13
**ridiculously** [1] -

22:1
**rings** [1] - 8:3
**ripping** [1] - 44:12
**risk** [1] - 13:15
**RMR** [2] - 1:22, 57:12
**ROBERT** [1] - 1:10
**role** [2] - 24:13, 24:16
**Ron** [1] - 50:14
**roof** [1] - 35:25
**Room** [1] - 52:15
**routine** [1] - 5:13
**Rule** [1] - 12:5
**running** [2] - 44:21, 48:9

**S**

**sacrifices** [1] - 37:16
**salary** [5] - 10:10, 10:11, 10:14, 25:3, 44:21
**Saturday** [1] - 34:1
**saved** [1] - 43:24
**saw** [17] - 5:16, 6:19, 7:5, 8:6, 11:14, 33:24, 34:13, 38:5, 38:25, 43:20, 43:24, 44:25, 45:19, 45:20, 45:25
**scenario** [1] - 19:18
**schedule** [1] - 52:13
**scheme** [5] - 6:11, 6:22, 6:25, 24:16, 24:19
**school** [2] - 31:18, 37:21
**SCOLA** [1] - 1:10
**screw** [1] - 50:23
**screw-ups** [1] - 50:23
**scum** [1] - 43:15
**search** [1] - 53:1
**seated** [2] - 2:1, 50:9
**second** [3] - 37:25, 46:16, 54:5
**Section** [2] - 21:4, 52:15
**see** [12] - 5:18, 7:17, 8:4, 13:1, 41:17, 42:13, 44:8, 44:24, 45:16, 45:18, 49:23, 56:13
**seeing** [3] - 4:11, 6:2, 24:24
**seem** [1] - 3:7
**sees** [1] - 13:7
**segment** [1] - 45:7
**self** [2] - 43:23, 53:1
**self-employment** [1]

- 53:1
**self-esteem** [1] - 43:23
**seminars** [1] - 39:22
**send** [3] - 43:5, 46:2, 48:22
**sense** [2] - 25:9, 51:3
**sent** [2] - 26:11, 29:4
**sentence** [28] - 3:15, 7:4, 12:14, 15:8, 19:2, 27:6, 29:23, 29:25, 35:2, 35:8, 35:11, 43:3, 47:13, 47:15, 50:4, 51:10, 51:15, 51:18, 53:9, 53:21, 53:23, 54:12, 54:16, 54:20, 55:13, 55:14, 56:9, 56:11
**sentenced** [4] - 12:3, 27:17, 52:4, 56:16
**sentences** [2] - 16:2, 49:1
**SENTENCING** [1] - 1:10
**sentencing** [16] - 2:15, 2:16, 5:14, 6:20, 8:21, 8:22, 10:16, 11:9, 11:13, 11:19, 16:18, 21:22, 28:23, 35:6, 51:17, 54:5
**Sentencing** [1] - 12:11
**sentencings** [1] - 24:4
**seriously** [1] - 23:24
**seriousness** [1] - 51:11
**serve** [1] - 54:16
**served** [2] - 12:13, 52:1
**service** [1] - 37:8
**services** [2] - 5:19, 21:25
**sessions** [1] - 7:7
**set** [3] - 2:15, 22:22, 34:22
**seven** [3] - 34:16, 39:16, 49:19
**severally** [1] - 52:7
**shall** [2] - 52:8, 52:14
**Shapiro** [1] - 5:25
**SHICK** [44] - 1:14, 2:7, 2:11, 2:17, 2:25, 3:16, 4:19, 4:21, 5:1, 5:6, 5:11, 6:8, 7:9, 7:13, 8:1, 8:17, 9:3, 9:25, 11:3, 11:9, 14:4, 14:18, 14:25, 15:7, 17:15, 17:19, 17:25, 18:15, 18:20, 18:25,

19:5, 19:11, 27:7, 27:16, 27:25, 28:13, 28:17, 29:2, 29:4, 29:21, 30:14, 54:25, 56:3, 57:2
**Shick** [2] - 2:7, 3:14, 4:3, 10:8, 26:11, 26:14, 26:19, 42:23, 43:1
**shock** [1] - 43:12
**shocking** [1] - 16:17
**shocks** [1] - 45:24
**shortly** [1] - 9:13
**shoulders** [1] - 6:14
**showed** [1] - 4:12
**shower** [2] - 38:17, 38:19
**showers** [1] - 38:15
**shut** [1] - 51:23
**side** [2] - 2:23, 45:5
**sides** [1] - 2:16
**sign** [1] - 34:23
**signed** [3] - 13:6, 30:15, 30:17
**significance** [1] - 3:13
**significant** [4] - 12:24, 13:8, 16:4, 16:22
**signing** [1] - 33:14
**signs** [1] - 34:24
**silent** [1] - 50:15
**simply** [2] - 26:7, 27:17
**sincerely** [1] - 18:25
**single** [1] - 6:2
**sink** [2] - 35:22, 35:23
**sister** [1] - 54:6
**sit** [1] - 18:4
**situation** [4] - 33:13, 33:14, 56:3, 56:4
**situations** [1] - 12:21
**six** [1] - 48:14
**skills** [1] - 40:23
**sleep** [3] - 34:10, 34:21, 34:25
**social** [3] - 37:1, 37:4, 37:8
**society** [4] - 41:22, 43:16, 44:4, 45:7
**solar** [1] - 38:13
**soldier** [1] - 23:16
**someone** [4] - 13:17, 14:9, 35:19, 36:16
**sometime** [1] - 55:11
**sometimes** [3] - 7:2, 42:2, 49:25
**somewhere** [2] - 32:17, 33:1

**soon** [3] - 5:14, 25:5, 35:21
**sorry** [5] - 14:9, 14:10, 32:1, 45:24, 50:18
**soul** [1] - 36:16
**sounds** [1] - 7:10
**South** [1] - 33:10
**Southeastern** [1] - 40:9
**SOUTHERN** [1] - 1:1
**Southern** [2] - 54:6, 54:17
**speaking** [1] - 36:23
**Special** [1] - 2:9
**special** [2] - 53:4, 53:11
**specific** [1] - 9:23
**specifically** [8] - 8:20, 9:7, 9:15, 9:25, 11:12, 11:19, 30:15, 54:17
**speeding** [2] - 36:7, 36:8
**spent** [3] - 41:18, 41:23, 42:11
**spite** [1] - 49:6
**squirrel** [1] - 22:19
**stand** [2] - 31:3, 36:20
**standard** [2] - 25:4, 52:21
**start** [2] - 5:15, 7:1
**started** [3] - 33:1, 34:14, 35:22
**state** [4] - 2:6, 3:14, 24:1, 48:24
**State** [1] - 33:1
**statement** [6] - 4:2, 8:1, 16:12, 17:16, 18:2, 23:2
**statements** [3] - 5:2, 25:17, 51:6
**STATES** [4] - 1:1, 1:4, 1:11, 1:15
**States** [5] - 2:2, 2:8, 52:14, 53:5, 57:12
**states** [3] - 3:14, 21:5, 22:1
**stating** [1] - 28:6
**statutory** [2] - 51:7, 55:13
**stay** [4] - 20:4, 31:17, 37:17
**steal** [1] - 23:22
**stealing** [1] - 23:23
**Stewart** [1] - 17:2
**still** [4] - 13:9, 20:20, 47:8, 48:2
**Street** [2] - 1:15, 1:18

**struck** [1] - 38:10
**student** [2] - 30:24, 32:12
**students** [5] - 31:11, 31:19, 32:4, 32:5
**studies** [1] - 40:15
**study** [2] - 37:10, 37:14
**stuff** [1] - 45:21
**stupid** [3] - 10:21, 10:23, 36:18
**subject** [1] - 19:6
**submit** [2] - 22:7, 53:14
**submitted** [1] - 23:4
**Subsection** [3] - 27:23, 27:24, 28:5
**substance** [1] - 52:22
**successfully** [1] - 40:10
**sudden** [1] - 34:2
**suffering** [1] - 44:25
**sufficient** [1] - 51:10
**suggest** [1] - 14:12
**suggesting** [1] - 14:8
**supervised** [3] - 52:18, 52:22, 53:10
**supervisor** [3] - 11:21, 40:22, 45:20
**support** [1] - 23:6
**supposed** [1] - 26:13
**surrender** [2] - 53:16, 53:19
**survey** [1] - 49:14
**sustain** [2] - 8:9, 8:13
**sworn** [1] - 43:25
**system** [2] - 20:9, 22:22

**T**

**table** [2] - 2:8, 18:4
**talks** [3] - 6:21, 12:20, 21:22
**Talladega** [2] - 54:8, 54:18
**target** [5] - 16:10, 16:15, 17:5, 18:8, 18:16
**targets** [2] - 16:14, 41:25
**taxes** [1] - 44:20
**teacher** [2] - 31:7, 31:10
**teaching** [4] - 31:9, 31:10, 31:13, 31:14
**team** [1] - 38:7

**teams** [1] - 38:4
**tearing** [1] - 44:4
**ten** [1] - 5:18
**Tennessee** [2] - 54:6, 54:17
**termination** [1] - 21:10
**terms** [4] - 3:15, 7:4, 10:16, 25:20
**terribly** [5] - 35:16, 36:4, 50:18
**terrific** [1] - 41:20
**tests** [1] - 34:13
**Thanksgiving** [2] - 46:25
**THE** [123] - 1:10, 1:14, 1:17, 1:25, 2:4, 2:5, 2:10, 2:14, 2:19, 2:20, 2:22, 3:2, 3:4, 3:5, 3:10, 3:22, 4:1, 4:2, 4:3, 4:15, 4:20, 4:25, 5:3, 5:8, 6:6, 7:4, 7:11, 7:23, 8:8, 8:9, 9:1, 9:23, 10:3, 11:8, 14:3, 14:13, 14:23, 15:1, 17:10, 17:17, 17:21, 18:13, 18:16, 18:21, 19:3, 19:9, 25:20, 26:24, 27:15, 27:22, 28:2, 28:14, 28:25, 29:3, 29:7, 29:20, 29:22, 30:2, 30:4, 30:5, 30:10, 30:13, 30:19, 31:2, 32:13, 32:15, 32:16, 35:1, 35:5, 36:24, 36:25, 37:2, 39:4, 39:5, 39:9, 39:10, 41:6, 41:7, 42:17, 42:20, 42:21, 42:25, 43:10, 44:8, 44:10, 44:11, 44:14, 44:18, 44:22, 45:18, 45:19, 47:12, 47:17, 47:21, 47:23, 47:24, 48:5, 48:8, 48:12, 48:21, 49:3, 49:5, 49:7, 49:21, 49:22, 50:3, 50:6, 50:9, 50:13, 50:14, 50:18, 51:5, 54:1, 54:9, 54:12, 54:14, 55:5, 55:12, 55:17, 55:21, 56:15, 56:20, 57:3
**theme** [3] - 6:25, 11:19, 13:12
**themselves** [2] - 37:9, 50:4
**therapeutic** [1] - 38:4

**therapist** [7] - 7:1, 13:6, 39:11, 40:2, 40:13, 46:12, 49:16
**therapists** [7] - 3:19, 6:24, 24:20, 24:24, 37:6, 45:5, 50:3
**therapists'** [1] - 6:14
**therapy** [7] - 6:7, 7:6, 40:7, 40:11, 40:16, 40:23, 40:25
**thereby** [1] - 28:9
**therefore** [2] - 11:2, 55:14
**Thereupon** [1] - 50:7
**they've** [3] - 12:12, 12:13, 29:15
**thieves** [1] - 50:1
**third** [4] - 4:13, 27:10, 28:19, 49:15
**Third** [1] - 1:18
**Thomas** [2] - 2:13, 39:15, 39:25, 41:2, 41:11
**THOMAS** [1] - 1:7
**thoughtful** [1] - 38:21
**thoughts** [1] - 44:18
**threat** [2] - 41:22, 41:23
**three** [6] - 27:1, 29:1, 38:12, 52:18, 53:10, 53:15
**throughout** [2] - 11:14, 16:1
**thrown** [1] - 50:21
**thrust** [1] - 38:20
**ticket** [3] - 36:7, 36:8
**timely** [4] - 28:8, 28:11, 28:20, 28:21
**title** [1] - 53:13
**today** [10] - 10:13, 13:24, 24:1, 36:21, 37:7, 42:23, 47:14, 47:21, 48:1
**together** [2] - 37:6, 38:3
**toilet** [1] - 35:25
**Tom** [7] - 33:16, 34:9, 35:21, 36:1, 39:14, 40:18, 41:15
**took** [5] - 10:5, 10:18, 12:7, 21:15, 35:24
**total** [3] - 27:2, 51:8, 53:9
**touch** [1] - 46:23
**touched** [1] - 38:18
**tough** [2] - 25:2, 38:4
**training** [1] - 11:22
**transcription** [1] -

57:8
**transition** [1] - 41:19
**transmission** [1] - 33:12
**transportation** [1] - 39:24
**transported** [1] - 39:23
**treat** [1] - 5:4
**treated** [2] - 22:4, 22:9
**treatment** [5] - 12:20, 12:24, 12:25, 52:23, 54:16
**trial** [5] - 18:5, 28:10, 29:12, 29:17, 35:6
**tricked** [1] - 33:14
**tried** [2] - 38:25, 49:19
**Tron** [2] - 39:7, 39:15
**Tron's** [1] - 39:8
**true** [9] - 5:2, 5:3, 8:7, 8:8, 12:25, 19:14, 22:5, 26:15, 29:3
**truly** [5] - 14:16, 24:16, 32:1, 50:20
**trust** [1] - 48:22
**trusting** [1] - 36:10
**try** [1] - 33:17
**trying** [10] - 8:21, 15:23, 20:19, 35:12, 47:17, 47:18, 48:19, 48:21, 49:5, 50:11
**turn** [2] - 11:12, 16:20
**turned** [5] - 10:8, 16:19, 42:4, 44:1
**tutoring** [1] - 11:22
**Twelfth** [2] - 1:23, 57:13
**two** [11] - 5:25, 20:8, 20:13, 22:12, 27:8, 33:8, 33:25, 34:3, 37:7, 49:18, 53:25
**type** [1] - 41:2
**typically** [1] - 5:6

**U**

**unable** [2] - 20:11, 54:21
**under** [17] - 4:23, 5:4, 5:5, 5:10, 12:10, 13:10, 21:3, 21:9, 21:12, 25:12, 25:25, 27:24, 28:4, 32:25, 34:15, 45:6, 55:12
**undergo** [1] - 52:22
**undid** [1] - 35:23

**unfold** [1] - 34:18
**unfolded** [1] - 34:17
**unfortunate** [1] - 32:7
**Ungaro** [2] - 12:4, 24:2
**Unicor** [2] - 52:9, 52:10
**UNITED** [4] - 1:1, 1:4, 1:11, 1:15
**United** [5] - 2:2, 2:8, 52:14, 53:5, 57:12
**universally** [1] - 49:15
**university** [1] - 37:13
**University** [2] - 32:22, 40:9
**unjust** [2] - 9:9, 48:16
**unless** [3] - 8:5, 52:13, 55:22
**unlikely** [4] - 4:6, 22:22
**unquote** [1] - 6:3
**untrue** [3] - 8:3, 22:1, 23:2
**up** [14] - 3:5, 4:12, 4:21, 16:4, 22:22, 24:17, 33:18, 34:21, 34:22, 35:12, 35:23, 38:8, 42:2, 56:4
**ups** [1] - 50:23
**US** [3] - 1:20, 2:21, 47:10
**utilize** [1] - 40:23

**V**

**valuable** [1] - 20:23
**variance** [4] - 30:16, 30:20, 55:1, 56:11
**various** [2] - 37:11, 39:22
**Varon** [2] - 24:15
**vary** [2] - 56:13, 56:17
**vast** [1] - 45:16
**versus** [2] - 2:2, 5:5
**veteran** [1] - 30:25
**view** [2] - 12:11, 34:17
**virtually** [1] - 8:4
**volume** [1] - 34:25
**voluntarily** [2] - 41:18, 53:16
**voluntary** [2] - 21:9, 21:12
**vs** [1] - 1:6
**vulnerable** [1] - 45:6

**W**

**wait** [1] - 56:21
**waiver** [1] - 55:2
**wallet** [1] - 33:11
**wants** [3] - 16:1, 25:24, 55:10
**warm** [2] - 38:14, 38:19
**warmth** [1] - 32:3
**water** [2] - 38:14, 38:20
**ways** [6] - 31:25, 36:18, 38:23, 38:25, 39:1, 51:1
**week** [4] - 6:1, 34:16, 48:14, 49:19
**weeks** [1] - 38:12
**weight** [1] - 10:14
**whereas** [1] - 25:10
**White** [4] - 16:6, 16:23, 20:24, 50:14
**whole** [3] - 11:13, 42:3, 51:1
**wholly** [1] - 12:7
**widow's** [1] - 36:1
**widowed** [1] - 25:22
**Wilkinson** [1] - 36:25
**WILKINSON** [1] - 37:3
**WILLIAM** [1] - 1:17
**William** [1] - 2:12
**willing** [1] - 38:9
**Wilma** [1] - 38:10
**wind** [1] - 42:2
**windup** [1] - 34:7
**withdraw** [4] - 9:6, 25:23, 25:24, 29:11
**withdrawal** [3] - 9:13, 9:14, 21:10
**withdraws** [1] - 56:1
**witnesses** [1] - 30:1
**words** [1] - 44:23
**worker** [2] - 37:1, 37:4
**works** [2] - 45:10, 52:9
**world** [1] - 41:19
**worship** [1] - 39:16
**write** [7] - 7:16, 12:1, 13:20, 14:1, 20:20, 23:17, 30:5
**writes** [2] - 10:21, 20:13
**writing** [3] - 5:21, 24:24, 34:8
**written** [4] - 4:10, 6:18, 26:5, 45:14
**wrote** [5] - 4:10, 9:5,

20:21, 26:7, 30:11

# Y

**year** [4] - 25:7, 33:25, 34:2, 34:7
**years** [13] - 31:6, 32:18, 33:13, 33:24, 34:1, 37:4, 39:16, 39:18, 41:12, 41:15, 51:25, 52:18, 53:10
**York** [1] - 33:9
**yourself** [5] - 17:7, 18:3, 18:18, 27:6, 49:6